IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Lori Ann Busche, | ) | OPINION |
| | ) | |
| Petitioner, Appellee, and Cross-appellant, | ) | Case No. 20080388-CA |
| | ) | |
| | ) | |
| v. | ) | F I L E D |
| | ) | (January 20, 2012) |
| Matthias Busche, | ) | |
| | ) | 2012 UT App 16 |
| Respondent, Appellant, and Cross-appellee. | ) | |
| | ) | |

-----

Fourth District, Provo Department, 044400503
The Honorable Claudia Laycock

Attorneys:      Rosemond G. Blakelock, Provo, for Appellant and Cross-appellee
                Douglas B. Thayer and Andrew V. Wright, Provo, for Appellee and
                Cross-appellant

-----

Before Judges Orme, Davis, and Roth.

ROTH, Judge:

¶1      Matthias Busche (Husband) appeals the district court's denial of his motion to modify his child support and alimony obligations following his termination from employment and subsequent employment at a lower salary. Husband also contends that the district court abused its discretion when it ordered him to pay $20,000 in attorney fees. Lori Ann Busche (Wife) filed a cross-appeal, in which she challenges the district court's decision to award her only $20,000 of the $51,000 she requested in attorney fees. We reverse the district court's finding that Husband's job loss did not

amount to a substantial change of circumstances because he was voluntarily underemployed and remand for reconsideration of whether he was in fact voluntarily underemployed. We affirm the attorney fees award of $3324.71 resulting from the August 29, 2005 order to show cause hearing but reverse and remand for reconsideration of the remaining attorney fees award.

BACKGROUND

¶2     The Busches married in June 1995 and divorced on January 7, 2005. At the time of the divorce, Husband was earning a gross monthly salary of $7067. The parties have five children, and Wife stayed home to care for them. As part of the stipulated divorce decree, the parties agreed that Husband would pay $1766 per month in child support and $1545 per month in alimony, for a total of $3311 in monthly support obligations.

¶3     Husband's employment as a manager for Tahitian Noni, however, ended on January 28, 2005, shortly after the divorce decree was entered. On June 21, 2005, Husband filed a verified petition to modify the support obligations of the divorce decree, citing his termination from employment through no fault of his own as "a substantial and material change in circumstances with regard to [his] income." The termination of Husband's employment followed written warnings from his employer in March 2004 and in December 2004, requiring him to correct certain behaviors the employer considered inappropriate. After discharging him as a regular employee, Tahitian Noni retained Husband as a contract employee at a rate of $5000 monthly. When the contract ended in early 2006, Tahitian Noni declined to renew it, and Husband remained unemployed until October 2, 2006, when he began work with SupraNaturals at a monthly salary of $4583.33.

¶4     The district court held a bench trial on June 7, 2007, to determine whether Husband's change in employment and coinciding pay decrease warranted a modification of the child support and alimony obligations as specified in the divorce decree. In its subsequent memorandum decision, the court attributed Husband's "less remunerative salary" to "his refusal to accept the [March and December 2004] warnings from his supervisor at Tahitian Noni to change his behavior and work habits," even though he had agreed, less than two weeks after the second warning, to pay a combined $3311 per month in child support and alimony. The court therefore found Husband to be voluntarily underemployed. Based on this finding, the district court determined that there was no substantial change in circumstances to warrant further consideration of Husband's petition to modify the decree's support orders.

¶5     The district court also awarded Wife some, but not all, of her attorney fees. Wife requested over $51,000 in attorney fees, which she incurred in the course of earlier order to show cause (OSC) proceedings as well as in connection with the trial on Husband's petition. The court granted Wife's request for $3324.71 in attorney fees from an August 29, 2005 OSC hearing. With respect to the remaining fees, the court found that Wife had prevailed at the OSC hearings and at trial and that she had shown a need but concluded that the attorney fees requested were "excessive." It also determined that Husband, after factoring in his support obligations, had very little ability to pay. In this regard, the court refused to consider Husband's equity in the marital home as a source of ongoing income for purposes of determining his ability to pay attorney fees. Accordingly, it granted Wife attorney fees in the reduced amount of $16,675.29, bringing the total fee award to $20,000.

¶6     The district court's findings and conclusions regarding the modification petitions and the award of attorney fees were memorialized in the Findings of Fact and Amended Decree of Divorce.[1] Husband now challenges the denial of his request for modification. Husband and Wife both appeal the attorney fees order.


ISSUES AND STANDARDS OF REVIEW

¶7     Husband challenges the district court's decision that there had not been an unforeseeable and substantial change in circumstances that warranted modification of the divorce decree's child support and alimony orders. His contention of error, in essence, has two components. Husband claims that the district court erroneously found him to be voluntarily underemployed. He also argues that the court abused its discretion in determining that the voluntary underemployment did not result in a substantial change of circumstances that warranted modification of his support obligations. In making this determination, Husband argues, the district court failed to properly conduct the statutorily-required imputation analysis that is part and parcel of a finding of voluntary underemployment and instead simply imputed income to him at the amount he earned when Tahitian Noni fired him--$7067 per month. "The

_____

1. Wife filed her own petition to modify in which she asked the district court to require Husband to submit copies of certain financial documents each year. The parties reached an agreement to exchange tax returns by April 30 of each year, and the court granted Wife's petition to modify the divorce decree as per their stipulation. That modification is not at issue in this appeal.

determination of the trial court that there [has or has not] been a substantial change of circumstances . . . is presumed valid, and we review the ruling under an abuse of discretion standard." *Young v. Young*, 2009 UT App 3, ¶ 4, 201 P.3d 301 (alteration and omission in original) (internal quotation marks omitted).  An abuse of discretion can occur if a trial court misapplies the law in exercising its discretion.  *See State v. Barrett*, 2005 UT 88, ¶ 17 & n.5, 127 P.3d 682.  We review the court's interpretation of statutory requirements for correctness.  *See Lilly v. Lilly*, 2011 UT App 53, ¶ 6, 250 P.3d 994.

¶8      Husband also challenges the district court's decision to award Wife her attorney fees, arguing that the court failed to enter findings on three statutorily-required factors.  While Wife purports to raise three issues for review, all of her claims relate to the issue of whether the district court properly awarded her attorney fees in an amount less than she requested.  We review the district court's decision to award attorney fees in a modification proceeding for an abuse of discretion.  *See Wilde v. Wilde*, 2001 UT App 318, ¶ 38, 35 P.3d 341.


ANALYSIS

I. Modification of the Divorce Decree's Support Obligations

¶9      Husband challenges the district court's determination that he was voluntarily underemployed and its consequent refusal to modify his support obligations.  As an initial matter, we consider whether the district court properly used its finding of voluntary underemployment as the basis for its conclusion that there was not a substantial change in circumstances sufficient to warrant modification of the support orders.

¶10     We then address Husband's contention that the district court erred in finding that he was voluntarily underemployed pursuant to Utah Code section 78-45-7.5(7) (the imputation provision).[2]  To support this contention, Husband first argues that the court

---

2. In 2008, the Utah Legislature renumbered the Utah Child Support Act, in which the imputation provision is located.  Because the imputation provision has also been substantively amended, however, we must refer to the version in effect during the lower court proceedings.  For convenience of the reader, we will generally refer to this provision as the imputation provision rather than by number within the text.  In

(continued...)

improperly relied upon deposition and affidavit testimony that was admitted only for impeachment purposes as the basis for its conclusion that Husband was terminated for cause. He then claims that even if the district court correctly determined that he had been terminated for cause, the court erred in equating termination for cause and voluntary underemployment. Rather, he argues the district court should have considered the factors identified in *Hall v. Hall*, 858 P.2d 1018 (Utah Ct. App. 1993), to make the determination whether he was voluntarily underemployed.

¶11     Finally, Husband claims that the district court failed to properly conduct an imputation analysis. The primary focus of this argument is his claim that the evidence did not support imputation of his full previous salary. Husband also asserts that the court should have applied the 2007 version of the imputation provision, rather than the 2006 version.[3]

A. The District Court Conflated the Substantial Change in Circumstances Analysis with the Imputation Analysis.

¶12     Utah law permits modification of child support and alimony orders when there has been a substantial change in circumstances. *See generally* Utah Code Ann. § 78B-12-210(9)(a) (2008) (permitting a parent to petition to modify child support obligations when "there has been a substantial change in circumstances"); Utah Code Ann. § 30-3-5(8)(g) (Supp. 2011) (stating that the district court has continuing jurisdiction to modify spousal support orders when there has been a "substantial material change in circumstances not foreseeable at the time of divorce"). In the case of child support orders, "a substantial change in circumstances may include . . . material changes of 30%

---

2. (...continued)
citation, however, we must reference the former numbering, which was 78-45-7.5(7). *See* Utah Code Ann. § 78-45-7.5(7) (Supp. 2006). Section 78-45-7.5(7) is now codified as section 78B-12-203(7). *See* Utah Code Ann. § 78B-12-203 amend. notes (2008).

          References to other pertinent sections of the child support act as well as to the divorce provisions governing modification of alimony, however, are to the current version because they are substantively identical to the version then in effect.

3. The 2006 version of the imputation provision is identical to the statute that was in effect when Husband's employment with Tahitian Noni first ended in January 2005. *Compare* Utah Code Ann. § 78-45-7.5(7) (Supp. 2006), *with id.* (2002). The parties have only referred to the 2006 version, and we therefore refer to it as well for consistency.

or more in the income of a parent." Utah Code Ann. § 78B-12-210(9)(b)(iii). In the alimony context, a substantial change in circumstances includes a change in income not anticipated in the divorce decree. *See Bolliger v. Bolliger*, 2000 UT App 47, ¶ 20, 997 P.2d 903; *see, e.g., Haslam v. Haslam*, 657 P.2d 757, 758 (Utah 1982) (reversing the denial of the petition to modify alimony where the wife, who was unemployed at the time of the divorce, was earning $1100 per month at the time of the modification petition and had substantial savings).

¶13  Here, it is undisputed that Husband's salary decreased by about 35%, from $7067 per month at the time the divorce decree was entered in January 2005 to $4583.33 per month in October 2006, and that such a decrease was not contemplated in the divorce decree itself.[4]  Nevertheless, in the findings of fact and amended decree of divorce, the district court declined to consider this change in income as the kind of "substantial change of circumstances" that would warrant consideration of Husband's petition to modify his support obligations, *see* Utah Code Ann. § 78B-12-210(9)(a); *accord* Utah Code Ann. § 30-3-5(8)(g), because it attributed the change to Husband's voluntary underemployment.  There is nothing in the applicable statutes, however, that links the reason for an unanticipated loss of income to the determination of whether that loss amounted to a substantial change of circumstances.  Rather, the court must first determine whether there is a substantial change in circumstances that warrants consideration of the modification petition, *see* Utah Code Ann. § 78B-12-210(9)(a) (child support modification statute); Utah Code Ann. § 30-3-5(8)(g) (spousal support modification statute), and if there is a substantial change, *then* the court shall conduct the imputation analysis, which involves determining whether the petitioner is voluntarily unemployed or underemployed and, if so, how much income ought to be imputed, *see* Utah Code Ann. § 78-45-7.5(7)(a)-(b) (Supp. 2006) (current version at Utah Code Ann. § 78B-12-203(7)(a)-(b) (2008)).  Thus, because Husband's decrease in salary amounted to a change in circumstances sufficient to warrant consideration of his modification petition, the court should have gone on to conduct an imputation analysis in order to determine whether modification of Husband's support obligations was ultimately warranted.  Instead, the court first addressed the issue of whether Husband's

---

4. Although Husband may have been aware that his income could significantly decrease if he failed to remedy the behaviors that were leading to the warnings regarding his job performance, "[t]he fact that [a] part[y] may have anticipated [a substantial material change in circumstances] in [his] own mind[] . . . does not mean that the decree itself contemplates the change." *See Bolliger v. Bolliger*, 2000 UT App 47, ¶ 13, 997 P.2d 903 (fourth alteration in original) (internal quotation marks omitted).

reduced income was the result of voluntary underemployment (part of the imputation analysis) and having decided that it was, never reached the issue of whether there was a substantial change of circumstances in the first instance. Doing so thus inappropriately conflated the threshold question of whether there is a substantial change of circumstance with the first stage of the imputation analysis.

B. The District Court Applied the Wrong Standard for Determining if Husband Was Voluntarily Underemployed.

¶14    We next turn to Husband's contentions that the district court improperly found him to be voluntarily underemployed and consequently abused its discretion in imputing his full prior salary. The district court found Husband to be voluntarily underemployed based on "his refusal to accept the warnings from his supervisor at Tahitian Noni to change his behavior and work habits," which had directly "resulted in his discharge" and his subsequent "less remunerative salary."[5] As a result, the court declined to consider modification of his existing support obligations.[6] According to Husband, income ought not be imputed to him because termination for cause does not necessarily constitute voluntary underemployment as the term is used in the

---

5. Husband contends that the district court could not have made this finding without improperly relying on the substance of deposition and affidavit testimony that was admitted solely for impeachment purposes. We need not address that issue, however, because our conclusion in this section that Husband's termination, even if for cause, cannot be the basis for a finding of voluntary underemployment renders any erroneous consideration of impeachment testimony harmless.

6. Husband contends that the court abused its discretion in imputing his full previous salary to him because the evidence did not support imputation of income at that level. Although Husband presents this as an insufficiency-of-the-evidence claim, it appears to us that the district court did not impute income to him at all. Rather, as explained above, once the court found that his termination from Tahitian Noni was for cause, it simply decided that his subsequently-reduced income was voluntary as well and equated Husband's voluntary underemployment with a lack of changed circumstances sufficient to warrant consideration of the petition to modify. It therefore declined to modify the support orders and left Husband's support obligations unchanged. Although the result was the same as it would be if the court had imputed income to Husband at his previous salary, the court actually did not conduct an imputation analysis and therefore did not impute income to Husband at all.

imputation provision. While Husband is correct that he was not voluntarily unemployed as a result of his termination from Tahitian Noni, we remand for further consideration regarding whether his subsequently-reduced income was the result of voluntary underemployment attributable to his actions after he initially lost the Tahitian Noni job and, if so, whether imputation of additional income is appropriate.

1. Husband's Termination Did Not Result in Voluntary Underemployment.

¶15    Although it may be tempting to place the burden of the loss of income stemming from a termination for misconduct on the culpable party rather than on a dependent spouse or child, the legislature has elected to allow imputation of income only when the petitioner's loss of employment is voluntary. Specifically, the imputation provision then in effect provided that "[i]ncome may not be imputed to a parent . . . in contested cases[ unless] a hearing is held and a finding made that the parent is *voluntarily* unemployed or underemployed." *Id.* § 78-45-7.5(7)(a) (emphasis added).[7]  The term "voluntarily," however, is not defined in the imputation provision, and Utah appellate courts have not previously had an opportunity to construe its meaning. When interpreting a statute, we first consult its plain language, "presum[ing] that the legislature used each word advisedly and giv[ing] effect to each term according to its ordinary and accepted meaning." *Arredondo v. Avis Rent A Car Sys., Inc.*, 2001 UT 29, ¶ 12, 24 P.3d 928 (internal quotation marks omitted). For this reason, "courts often refer to the dictionary to define statutory terms." *Keene v. Bonser*, 2005 UT App 37, ¶ 10, 107 P.3d 693.

¶16    *Black's Law Dictionary* defines the word "voluntarily" to mean "[i]ntentionally; without coercion." *Black's Law Dictionary* 1710 (9th ed. 2009); *cf.* Random House, Inc., *Dictionary.com Unabridged, available at* http://dictionary.reference.com/browse/voluntary (last visited Jan. 6, 2012) (defining "voluntary" as "acting or done without compulsion or obligation"; "done by intention, and not by accident"). Because the word "'voluntarily' directly modifies the phrase 'unemployed or underemployed[,'] [t]he plain, definite, and sensible meaning of the provision, then, is that a [petitioner] is 'voluntarily unemployed or underemployed' when [he or she] intentionally chooses of his or her own free will to become unemployed or underemployed." *In re J.R.T.*, 55 P.3d 217, 219 (Colo. Ct. App. 2002), *aff'd*, 70 P.3d 474 (Colo. 2003) (en banc); *cf. Chandler v.*

---

7. Although the section of the Utah Code that addresses imputation is located in the Utah Child Support Act, "it is also relevant to imputation in the alimony context." *Fish v. Fish*, 2010 UT App 292, ¶ 14 n.5, 242 P.3d 787.

*Department of Emp't Sec.*, 678 P.2d 315, 320 (Utah 1984) (Oaks, J., writing for the majority on this issue) ("In the context of th[e workers' compensation] statute, "voluntarily" simply means at the volition of the employee, in contrast to a firing or other termination at the behest of the employer."). A petitioner who is involuntarily terminated, even as a result of his or her wrongful actions, does not deliberately choose to lose the job and therefore cannot be considered voluntarily unemployed or underemployed simply because the termination was for cause. This interpretation not only tracks the plain meaning of the phrase but also is consistent with the imputation provision's goal of imputing income "to prevent parents [and spouses] from reducing their child support or alimony by *purposeful* unemployment or underemployment."[8] *Griffith v. Griffith*, 959 P.2d 1015, 1018 (Utah Ct. App. 1998) (emphasis added), *aff'd*, 1999 UT 78, 985 P.2d 255; American Law Inst., *Principles of the Law of Family Dissolution: Analysis and Recommendations* § 3.14(5) cmt. e(i) (2002) ("Imputation is used when the obligor is believed to be concealing income or to be shirking in his efforts to earn income.").

¶17     In addition, our interpretation of voluntary unemployment or underemployment to mean deliberate job loss accords with the decisions of a number of courts in other jurisdictions that have concluded that termination for cause, even termination resulting from misconduct, does not constitute voluntary unemployment or underemployment. For example, in *In re J.R.T.*, 70 P.3d 474 (Colo. 2003) (en banc), a father was ordered, by two separate trial courts, to pay child support for his minor children based on a monthly salary of $4510, *see id.* at 475-76. Shortly thereafter, the father was terminated from his employment for violating the company's sexual harassment policies. *See id.* at 475. He was subsequently hired and terminated from a second position for failing to timely deposit company funds. *See id.* Finally, the father was able to obtain employment at a monthly salary of $2167, and he moved to reduce his child support obligations. *See id.* The trial courts in both cases found him to be voluntarily underemployed because he had been terminated due to misconduct. *See id.* at 475-76.

---

8. Indeed, however inviting it may seem under the circumstances, alimony and child support are not intended to be used as a form of punishment. *See, e.g.*, *English v. English*, 565 P.2d 409, 411 (Utah 1977) ("The purpose of alimony is to provide support for [one spouse] and not to inflict punitive damages on the [other]. Alimony is not intended as a penalty against the [paying spouse] nor a reward to the [dependent spouse] . . . ." (internal quotation marks omitted)); *Connell v. Connell*, 2010 UT App 139, ¶ 16, 233 P.3d 836 ("The purpose of . . . imputation is to prevent parents from reducing their child support or alimony by purposeful unemployment or underemployment." (internal quotation marks omitted)).

The Colorado Supreme Court consolidated the two cases and undertook an analysis of what the term "voluntarily" means in the context of determining whether a parent is voluntarily underemployed. *See id.* at 476-78. The court observed that

> [a]bility to pay is generally calibrated on the basis of actual gross income, unless the facts of the case indicate that the parent is voluntarily . . . underemployed. . . . "Imputation is troubling when the obligor is charged with obligations that he may not be able to pay, even with the best of efforts. . . ."
>
> . . . . [Moreover], the automatic imputation of income at the level of pay the parent earned before being fired would prevent the court from examining the present circumstances of the parent's incom[e] earning ability, would not result in like treatment for similarly situated parents, and would not necessarily take into account the best interests of the child.

*Id.* at 478-79 (quoting American Law Inst., § 3.14(5) cmt. e(i)). After considering the goals of the statute and its legislative history, the court decided that the legislature "intended income imputation to be an important exception to the normal rule of computation based on actual gross income." This exception arises only when the petitioner "shirks his or her child support obligation by unreasonably foregoing higher paying employment that he or she could obtain," either by deliberately leaving a higher-paying position or by unreasonably failing to seek more lucrative pay once the higher income has been lost. *See id.* at 479.

¶18    Other jurisdictions have adopted a similar definition of voluntary unemployment or underemployment. *See, e.g.*, *Hart v. Hart*, 561 A.2d 151, 152 (Conn. App. Ct. 1989) ("It is particularly appropriate to base a financial award on earning capacity where there is evidence that the payor has voluntarily quit or avoided obtaining employment in his field."); *Guard v. Guard*, 993 So. 2d 1086, 1089-90 (Fla. Dist. Ct. App. 2008) (agreeing with the husband that forced resignation by itself did not constitute voluntary underemployment); *Pace v. Pace*, 24 P.3d 66, 68-69 (Idaho Ct. App. 2001) (noting that although "'it was [the mother]'s willful choice to improperly use prescription drugs[, which led to termination],'" the termination itself was not voluntary); *In re Marriage of Johnson*, 950 P.2d 267, 270 (Kan. Ct. App. 1997) ("Voluntary conduct that results in an involuntary loss of income does not necessarily determine

that a parent is deliberately unemployed or underemployed."); *Lee v. Lee*, 459 N.W.2d 365, 370 (Minn. Ct. App. 1990) ("Even assuming the willfulness of [the father]'s on-the-job misconduct . . . , we are cited to no authority which permits a tribunal to equate willful misconduct with voluntary termination where there is no evidence that the misconduct was an attempt to induce termination and thereby avoid a child support obligation."); *In re Sarvela*, 910 A.2d 1214, 1223 (N.H. 2006) ("A parent who is involuntarily terminated from his or her employment, or . . . involuntarily resigns from that employment, did not 'voluntarily' become unemployed or underemployed."); *Wilson v. Wilson*, 43 S.W.3d 495, 497 (Tenn. Ct. App. 2000) ("We do not think that any time an obligor parent is fired for misconduct he or she is willfully unemployed under that provision of the child support guidelines. Although there is no requirement that a parent intended to avoid [his or her] child support obligations by [his or her] actions, we do think that willful or voluntary unemployment or underemployment must result from an intent on the part of the parent to reduce or terminate his or her income."); *Adkins v. Adkins*, 656 S.E.2d 47, 53 (W.Va. 2007) (noting that West Virginia's imputation provision has been interpreted in a manner that excludes "an involuntary termination, including those that are for cause and which involve intentional conduct," from the definition of voluntary underemployment for which income may be imputed).[9] The

---

9. We have located cases from three jurisdictions that have held that termination for cause constitutes voluntary unemployment or underemployment. Only one, however, actually interprets the "voluntary unemployment or underemployment" language to include terminations for cause. In that case, the Kentucky Court of Appeals, in an unpublished decision, rather summarily extended the reasoning of an earlier case that held that an incarcerated parent was voluntarily underemployed to a case where a father was terminated for violating his company's drug policy. *See H.E.S. v. Commonwealth*, No. 2008-CA-001006-ME, 2009 WL 414597, at *1 (Ky. Ct. App. 2009) (stating that like the incarcerated parent, it was "apparent that [the father who failed to comply with company policy was] voluntarily engaged in conduct which he should have known would impair his ability to support his children" (internal quotation marks omitted)). In the other two jurisdictions, the applicable statutes explicitly include an element of fault. *See Woehl v. Woehl*, 2002 SD 6, ¶¶ 8, 15, 639 N.W.2d 188, 190-92 (rejecting "the notion that . . . [the] resulting termination of [a father who struck his coworker-girlfriend at their place of employment] cannot be considered voluntary because he did not provoke termination for the express purpose of avoiding child support" on the basis that the applicable statute permits a court to impute income where "[t]he voluntary act of [the] parent . . . reduces that parent's income" (third

(continued...)

American Law Institute appears to have adopted a view of the law that would support a similar approach to the concept of voluntary unemployment or underemployment in termination-for-cause cases: "Imputation is used when the obligor is believed to be concealing income or to be shirking in his efforts to earn income." American Law Inst., § 3.14(5) cmt. e(i).

¶19    Wife argues that the interpretation of the voluntary underemployment aspect[10] of the imputation provision to require an intentional shirking in one's efforts to earn an appropriate income, rather than simply termination for cause, is precluded by our recent decision in *Connell v. Connell*, 2010 UT App 139, 233 P.3d 836. This argument is not persuasive. In *Connell*, we upheld the trial court's imputation of income based on its finding that the husband's forced resignation from his job at Brigham Young University (BYU) was for cause, *see id.* ¶¶ 19-20, and our opinion therefore states that termination for cause, followed by a reduction in salary, can amount to voluntary underemployment. The focus of the appeal, however, was not on whether the husband's loss of his job at BYU was voluntary, which the husband did not contest, but on whether his earlier deliberate departure from Novell, Inc. for a lesser-paying job amounted to voluntary underemployment under the statute. *See id.* ¶¶ 14-15. Because the husband did not actually raise, as a claim of error on appeal, the issue of whether his forced resignation from BYU for misconduct constituted voluntary underemployment, *Connell*'s statement that the husband's for-cause job loss resulted in voluntary underemployment does not amount to a holding. Rather, it is a recognition

---

9. (...continued)
alteration in original) (internal quotation marks omitted)); *see also Ewing v. Ewing*, 2004 PA Super. 46, ¶ 23 (noting that the statutory provision includes "fired for cause" in its definition of "voluntary reduction of income").

In three other jurisdictions, the pertinent state law expressly prohibits a district court from granting a petition to reduce support obligations based on a change in circumstances attributable to the petitioner's voluntary acts. *See, e.g., In re Marriage of Imlay*, 621 N.E.2d 992, 993-95 (Ill. App. Ct. 1993); *Murphy v. Murphy*, 759 N.W.2d 710, 715-16 (Neb. Ct. App. 2008); *Edwards v. Lowry*, 348 S.E.2d 259, 261 (Va. 1986), *superseded by statute on other grounds as stated in Farley v. Liskey*, 401 S.E.2d 897, 898-99 (Va. Ct. App. 1991).

10. In this discussion, we sometimes refer to the "voluntary unemployment or underemployment" element of the imputation provision as simply the "voluntary underemployment" element. This shorthand is for ease of reference.

of the basis for the district court's unchallenged decision to impute income at the lower level of the BYU salary, rather than at the higher Novell salary.  That statement, therefore, does not have the precedential significance that Wife claims.

¶20    In the end, based on our interpretation of the imputation provision and our own relevant case law, we agree with the conclusion of the Colorado Court of Appeals "that whether a person lost a job because of willful or knowing misconduct is not determinative of whether the person is voluntarily unemployed or underemployed." *In re J.R.T.*, 55 P.3d 217, 220 (Colo. Ct. App. 2002), *aff'd*, 70 P.3d 474 (Colo. 2003) (en banc).  Instead, the job loss itself must be intentional.  As a result, the district court's finding that Husband was voluntarily underemployed simply based on the for-cause nature of his termination from Tahitian Noni was in error.

       2.  On Remand Husband's Conduct Posttermination May Be Examined To Determine Whether There Is Voluntary Underemployment.

¶21    Nevertheless, our decision that termination for cause does not in itself constitute voluntary underemployment does not conclude the inquiry.  As the Colorado Court of Appeals stated in *In re J.R.T.*, 55 P.3d 217 (Colo. Ct. App. 2002), *aff'd*, 70 P.3d 474 (Colo. 2003) (en banc),

> What is determinative . . . is the person's subsequent course of action and decision making.  A person who has been involuntarily terminated from a position may thereafter become voluntarily . . . underemployed by not attempting in good faith to obtain new employment at a comparable salary or by refusing to accept suitable employment offers.

*Id.* at 220 (citing *Jensen v. Jensen*, 877 S.W.2d 131, 136 (Mo. Ct. App. 1994)).  Adopting a similar approach, a Florida appellate court has held that even after finding that the parent was not voluntarily underemployed as a result of termination or forced resignation, a court must consider "what that parent has done since the prior employment, i.e., whether he or she has remained unemployed or underemployed voluntarily" as a result of the party's "pursuit of his own interests or through less than diligent and bona fide efforts to find employment paying income at a level equal to or better than that formerly received," *see Guard*, 993 So. 2d at 1089 (internal quotation marks omitted).  In other words, after determining that a petitioner's for-cause job loss did not result in voluntary unemployment or underemployment, the district court must then consider what the petitioner has done in the aftermath of termination to determine

whether he or she has become voluntarily underemployed by virtue of his or her failure to then make reasonable efforts to obtain employment at a pay rate comparable to that of the lost employment. This determination necessarily depends on whether there are jobs available in the relevant market for a person with the party's qualifications and experience.

¶22    In *Hall v. Hall*, 858 P.2d 1018 (Utah Ct. App. 1993), we described the appropriate analysis for assessing whether a person's continuing underemployment following termination is voluntary. *See id.* at 1023-27. Although the precise issue in *Hall* was whether income could be imputed in the absence of a finding of voluntary underemployment, *see id.* at 1024, we identified several factors pertinent to the determination of whether underemployment is actually voluntary:

> Although the trial court found that appellant is currently earning less than he was previously, that isolated finding does not answer the critical question of whether the drop in earnings was voluntary. Rather, appellant's current earnings, as compared to his historical income, is merely one element in the matrix of factual issues affecting the ultimate finding of whether appellant is underemployed. Many critical questions are left unanswered: What are appellant's abilities? Is appellant's current salary below the prevailing market for a person with his abilities? Are there any job openings for a person with appellant's abilities? At a minimum, the trial court must determine appellant's employment capacity and earnings potential . . . before it [can] logically conclude that he is, in fact, underemployed.

*Id.* at 1026. These factors closely align with those identified in the imputation provision for determining how much income is appropriately imputed. *See generally* Utah Code Ann. § 78-45-7.5(7)(b) (Supp. 2006) (current version at 78B-12-203(7)(b) (2008)) ("If income is imputed to a parent, the income shall be based upon employment potential and probable earnings as derived from work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds in the community, or the median earning for persons in the same occupation in the same geographical area as found in the statistics maintained by the Bureau of Labor Statistics."). This overlap is not merely coincidental but rather stems from the nature of the imputation inquiry. That is, in cases where the initial job loss was not intentional and the focus is on the petitioner's conduct in the aftermath, the factors that the legislature identified in the

imputation provision are as relevant to the determination of whether the party is in fact voluntarily underemployed as they are to the determination of the specific amount that ought to be imputed. This is because reduced income in the aftermath of job loss does not itself support a reasonable inference that the underemployment is voluntary; rather, such a finding of *voluntary* underemployment must be based on evidence that the party could be earning more with reasonable effort. Consequently, the petitioner's skills and experience as well as the prevailing wages for a person with his or her qualifications, that is, the considerations outlined in the imputation provision and in *Hall*, are pertinent to the district court's assessment of voluntariness.

¶23    Put differently, the court must determine whether there are jobs reasonably available to someone with the party's qualifications and experience. Should the court determine that the petitioner is indeed voluntarily underemployed and that imputation is appropriate under the circumstances, it may then proceed to refine the analysis to arrive at a specific amount of income to be imputed. *See Connell*, 2010 UT App 139, ¶¶ 16-17 (stating that "a finding of voluntary underemployment does not require a court to impute the higher income; it merely allows it to do so" after weighing the factors in the imputation provision (citing *Hill v. Hill*, 869 P.2d 963, 964-65 (Utah Ct. App. 1994))); *see also In re J.R.T.*, 70 P.3d 474, 478-79 (Colo. 2003) (en banc) ("*[A]utomatic* imputation of income at the level of pay the parent earned before being fired would prevent the court from examining the present circumstances of the parent's incom[e] earning ability, would not result in like treatment for similarly situated parents, and would not necessarily take into account the best interests of the child." (emphasis added)); *Pace v. Pace*, 24 P.3d 66, 69 (Idaho Ct. App. 2001) (refusing to impute income to a nurse who was attempting to rehabilitate from the prescription drug addiction that resulted in her termination from employment where to do so would "add[] to an accumulating burden which falls upon the parent at a time when [s]he is least able to bear it").[11]

---

11. There are several Utah cases where the obligated party is incarcerated following a criminal conviction and income is imputed in the amount the party would be earning but for the incarceration, regardless of the realities of the party's ability to make support payments. *See, e.g., Young v. Young*, 2009 UT App 3, ¶ 13, 201 P.3d 301; *Proctor v. Proctor*, 773 P.2d 1389, 1391 (Utah Ct. App. 1989) (mem.). In those cases, the imputation analysis is cursory, apparently because the choice to commit a criminal act results in the party being unable to work and thereby fulfill his or her support obligations. *See generally Commonwealth ex rel. Marshall v. Marshall*, 15 S.W.3d 396, 401-02 (Ky. Ct. App.

(continued...)

¶24    While the district court in the case before us did make some findings regarding the statutory factors, its finding of voluntary underemployment was ultimately premised on its conclusion that Husband's conduct at work led to his termination and the subsequent reduction in his income.  We therefore remand for the district court to reconsider whether Husband's "subsequent course of action and decision making" rendered him voluntarily underemployed.  *See In re J.R.T.*, 55 P.3d 217, 220 (Colo. Ct. App. 2002).  In making this decision, the district court must address the factors identified in *Hall* and codified as subsection (7)(b) of the imputation provision.[12]  If, on

---

11. (...continued)
2000) (reversing a reduction of a child support obligation for an incarcerated father because "he voluntarily engaged in conduct which he should have known would impair his ability to support his children").  Our decision here does not reach the situation of an obligor who is out of a job as the result of a choice to engage in criminal activity.

12.  Husband contends that the district court should use the 2007 version of the imputation provision, which became effective on July 1, 2007, rather than the 2006 version, which was in effect at the time of the underlying events and through the time of trial, *see* Utah Code Ann. § 78-45-7.5(7) (2002, Supp. 2006, & Supp. 2007) (current version at Utah Code Ann. § 78B-12-203(7) (2008)).  It is well established that "[w]hen adjudicating a dispute we apply the version of the statute that was in effect at the time of the events giving rise to [the] [action]," *Connell v. Connell*, 2010 UT App 139, ¶ 16 n.4, 233 P.3d 836 (second and third alterations in original) (internal quotation marks omitted).  Although there are some limited exceptions to this rule, Husband has not persuaded us, with regard to subsection (7)(a) of the imputation provision, that any such exceptions were applicable at the time of the trial on June 7, 2007.

In *Hall v. Hall*, 858 P.2d 1018 (Utah Ct. App. 1993), however, this court identified the availability of employment opportunities as one of the factors relevant to determining whether one is voluntarily underemployed.  *See id.* at 1026.  As we have discussed, the *Hall* factors are substantially identical to the statutory factors listed in subsection (7)(b).  For this reason, we view the 2007 amendment to subsection (7)(b) as having clarified the statute by specifically identifying "employment opportunities" as a factor, rather than having added it as a new one.  As *Hall* implicitly recognized, the *availability* of opportunities for more remunerative employment is a natural and logical consideration in the analysis of whether unemployment or underemployment is

(continued...)

remand, the district court finds Husband to be voluntarily underemployed, it must then determine, based on the statutory factors and in the exercise of its discretion under the circumstances, whether income ought to be imputed to Husband, and if so, how much.[13] In addressing these issues on remand, the trial court has considerable discretion to decide whether it is appropriate to reopen the hearing to take additional evidence or for any other proper purpose, given the nature of our ruling here.

## II.  Attorney Fees

¶25    We now consider whether the district court properly exercised its discretion in awarding Wife $20,000 in attorney fees, rather than the $51,000 that she requested, and whether it made the appropriate findings to support the award.  Specifically, Husband argues that the award is not sustainable because the district court did not make detailed findings about the reasonableness of the fees, Wife's need, or Husband's ability to pay. Wife's argument that the district court exceeded its discretion in reducing the fees to $20,000 is based on three contentions.  First, she asserts that the court erred in deciding that Husband's equity in the marital home was not income for purposes of attorney fees.  Second, she claims that the determination that the requested fees were unreasonable was an abuse of the district court's discretion.  Finally, she contends that the district court improperly considered the amount of Husband's attorney fees, which were not part of the evidence, in making that determination.

---

12.  (...continued)
voluntary.

13.  Husband argues, in his reply brief, that the district court must take into consideration his tax liability when calculating his alimony obligation.  *See generally Fish v. Fish*, 2010 UT App 292, ¶ 21, 242 P.3d 787 (instructing the trial court to consider the husband's tax liability on imputed income as part of its examination of his ability to pay alimony); *Andrus v. Andrus*, 2007 UT App 291, ¶¶ 17-18, 169 P.3d 754 (remanding for additional findings on the husband's ability to pay alimony when the district court was presented with evidence of his tax obligations but did not make any findings that demonstrated whether it had considered these payments in calculating his income).  We decline to consider this claim, however, because it was presented for the first time in the reply brief and is therefore waived.  *See generally Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (internal quotation marks omitted)).

¶26     The district court has broad discretion to award attorney fees in a divorce decree modification action, and we reverse such an award only if it is "seriously inequitable or otherwise unjust." *Young v. Young*, 2009 UT App 3, ¶ 21, 201 P.3d 301.  To allow meaningful appellate review, however, the decision to award attorney fees must be supported by detailed findings of fact.  *See Connell v. Connell*, 2010 UT App 139, ¶ 27, 233 P.3d 836.  There are two classes of attorney fees that may be awarded in a divorce proceeding, each with different requirements.  *See id.* ¶ 28.  "Fees awarded . . . [for establishing a support order] must be based on the usual factors of need, ability to pay, and reasonableness."  *See id.; see also* Utah Code Ann. § 30-3-3(1) (Supp. 2011).  "By contrast, in awarding fees . . . [for enforcing an existing support order,] the court may disregard the financial need of the moving party.  The guiding factor . . . is whether the party seeking an award of fees substantially prevailed on the claim."  *Connell*, 2010 UT App 139, ¶ 28 (internal quotation marks and additional citations omitted) (citing Utah Code Ann. § 30-3-3(2)); *see id.* ¶ 30 (noting that this is because fees awarded for enforcing an existing order "serve no equalizing function but allow the moving party to collect fees unnecessarily incurred due to the other party's recalcitrance").  The district court, however, retains its discretion to reduce or eliminate attorney fees if the paying party is unable to pay or if there is another basis for reduction.  *See* Utah Code Ann. § 30-3-3(2).  The district court here made two awards of attorney fees:  one in the amount of $3324.71--the full amount requested--for fees incurred at the August 29, 2005 OSC hearing and one in the amount of $16,675.29--reduced from the requested amount of approximately $48,000--to cover the remainder of Wife's accrued fees.  We will address the propriety of each award in turn.

A.  The District Court Properly Awarded Attorney Fees in the Amount of $3324.71 for the August 29, 2005 OSC Hearing.

¶27     In June 2005, Wife filed a motion for an order to show cause on the basis that Husband was not paying alimony or child support as required by the divorce decree.  As a result, the district court ordered Husband to make back payments.  It reserved the issue of attorney fees, however, until trial.  At trial, Wife requested an award of fees for the OSC hearing in the amount of $3324.71 and provided supporting documentation.  The district court determined Wife to be the prevailing party at that hearing, found the fees to be "appropriate," and awarded Wife the $3324.71 she requested.  Husband now argues that the court failed to make findings regarding Wife's need.  Wife's need, however, is not "relevant" in actions to enforce existing support orders.  *See Connell*, 2010 UT App 139, ¶¶ 28, 31 (stating that the financial need of the moving party may be disregarded in enforcement actions).  Rather, reasonable attorney fees may be awarded to the prevailing party.  *See id.*  Because the district court made the requisite findings

and there is no challenge to those findings, we affirm the award of $3324.71 in attorney fees from the August 29, 2005 OSC hearing.

B.  It Is Necessary To Remand for Additional Findings with Respect to the Remaining Attorney Fees.

¶28    Wife also requested approximately $48,000 for attorney fees that were incurred at earlier OSC hearings and at trial.  Although Wife provided the district court with a breakdown of these fees for reference, the court did not distinguish between fees incurred to enforce existing support orders (OSC hearing fees) and those incurred in establishing a new order (trial fees) in making the award.  Because the district court did not make this distinction, we cannot conduct a meaningful review of its conclusions. *See generally id.* ¶ 27 (requiring the trial court to make adequate findings of fact to permit appellate review).  We recognize that the district court made findings on all the required factors applicable to an award of trial fees (Wife's need, Husband's ability to pay, the reasonableness of the requested fees) and OSC hearing fees (Wife's status as the prevailing party).  But because the analyses were combined, with the fees from each proceeding lumped together without distinction, we cannot meaningfully assess whether the award constituted a proper exercise of discretion.  Remand will allow the district court an opportunity to more clearly enunciate its findings with respect to the two types of claims for attorney fees and more fully explain its reasoning for any reductions.  Furthermore, the court's determination about whether Husband is in fact voluntarily underemployed directly relates to Husband's ability to pay and may affect the district court's decision regarding trial fees.  We therefore reverse the award and remand for the entry of attorney fees with the requisite findings for each type of award.

1.  Findings on Remand

¶29    On remand, should the district court award Wife attorney fees incurred during the OSC hearings, "its order should be supported by a finding that Wife substantially prevailed on the motions for which she seeks attorney fees." *See Connell*, 2010 UT App 139, ¶ 32.  If it reduces or precludes Wife's recovery of attorney fees from the OSC hearings, it must include "a finding that Husband is impecunious or a statement on the record of its reason for its decision," such as a finding that the requested fees were unreasonable. *See id.*

¶30    If the district court awards attorney fees incurred at trial, it must make findings regarding "Wife's need, Husband's ability to pay, and the reasonableness of the fees." *See id.* An award of less than all the fees requested should include an explanation of how the court arrived at the amount awarded. *See generally Rappleye v. Rappleye*, 855

20080388-CA                    19

P.2d 260, 266 (Utah Ct. App. 1993) (remanding for further consideration of the reasonableness of the attorney fees award because the factual findings did not adequately explain why the district court awarded the wife $5000 when she requested over $15,000). In addition, contrary to Wife's contention, it appears to us that the district court properly understood that it could not consider Husband's counsel's unsworn statement that Husband's fees were approximately one-fifth of Wife's as evidence that Wife's fees were unreasonable, and we anticipate that on remand it will also base its reasonableness finding solely upon the competent and admissible evidence presented to it.

### 2. Home Equity

¶31    In connection with any award of attorney fees, the district court may consider all sources of income but, contrary to Wife's position, is not required to treat Husband's equity in the marital home as income. The cases relied upon by Wife help to illustrate this maxim. For example, in *Crompton v. Crompton*, 888 P.2d 686 (Utah Ct. App. 1994), this court held that

> it would be inappropriate for an appellate court to tie the hands of a trial court by confining its consideration of income in every case to only that which springs from a forty-hour-week source. A trial court must be able to consider all sources of income that were used by the parties during their marriage to meet their self-defined needs, from whatever source--overtime, second job, self-employment, etc., as well as unearned income.

*Id.* at 689. Wife argues that the home equity here is the type of "unearned income" referenced in *Crompton*. In *Crompton*, however, the husband had consistently worked twenty to thirty hours in overtime each week throughout the marriage. *See id.* at 688. Because the parties had established a lifestyle that consumed this additional income, the trial court imputed income to the husband that included overtime pay. *See id.* In affirming, this court recognized that the overtime income was enjoyed during the marriage and was "regular, consistent and predictable." *See id.* In the instance case, the home equity is a one-time source that came into being because of the divorce. Moreover, the language in *Crompton* merely grants the trial court the flexibility to consider all sources of income. Nothing about the language of this case, or other cases cited by Wife, mandates that the court consider all the paying party's assets, such as home equity, as income for purposes of calculating support orders; rather, the matter is left to the court's judgment. *See, e.g., Young v. Young*, 2009 UT App 3, ¶¶ 23-24, 201 P.3d

301 (concluding that the trial court's consideration of the husband's proceeds from the sale of the marital home in determining his ability to pay attorney fees was within its discretion where the husband was incarcerated and had no other source of income);[14] *cf. Adelman v. Adelman*, 815 P.2d 741, 745-46 (Utah Ct. App. 1991) (affirming the trial court's decision to allow the wife to collect past-due alimony and unreimbursed medical expenses for the minor children, monies that had already been deemed the husband's responsibility, from the husband's equity in the marital home). We decline to adopt such a requirement here.

## C. Attorney Fees on Appeal Are Not Warranted.

¶32    Finally, Wife requests attorney fees on appeal. Wife's request, however, is limited to fees pursuant to rule 33 of the Utah Rules of Appellate Procedure. Under rule 33, a party may recover attorney fees incurred on appeal where the argument "is one that is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law." Utah R. App. P. 33(b). Based on our decision here, rule 33 does not support an award of attorney fees against Husband on appeal.


## CONCLUSION

¶33    Husband's change in income constituted a substantial change in circumstances that warranted consideration of his modification petition. Because Wife alleged that Husband's reduced income was due to voluntary underemployment after his involuntary termination, the court was required to conduct the imputation analysis to determine if Husband was in fact voluntarily underemployed and, if so, whether income ought to be imputed to him. We reverse the district court's finding that Husband was voluntarily underemployed based solely on his termination from Tahitian Noni and remand for the court to consider whether Husband is voluntarily underemployed based on his posttermination conduct and if so, to calculate how much income, if any, to impute to him.

---

14. Wife also directs us to the decision of *Madsen v. Madsen*, No. 971680-CA, 1998 WL 1758391 (Utah Ct. App. 1998) (mem.). In that case, the trial court ordered the husband to pay $2000 in attorney fees, which it found he could pay from his equity in the marital home. *See id.* at *2. This court, however, remanded for additional findings to support the amount of the award. *See id.* There was no discussion about whether the court's consideration of home equity as income was proper. *See id.*

¶34    With respect to attorney fees, we affirm the award of $3324.71 incurred at the August 29, 2005 OSC hearing.  We reverse, however, the attorney fees award in the amount of $16,675.29 and remand for the district court to make findings consistent with this opinion in support of any fees awarded beyond the $3324.71.  Wife's request for attorney fees on appeal is denied.

_____
Stephen L. Roth, Judge

-----

¶35    WE CONCUR:


_____
Gregory K. Orme, Judge


_____
James Z. Davis, Judge