2020 UT App 62

# THE UTAH COURT OF APPEALS

JAMES J. ISSERTELL JR.,
Appellee,
*v.*
TISH KRISTINA ISSERTELL,
Appellant.

Opinion
No. 20190467-CA
Filed April 16, 2020

Second District Court, Farmington Department
The Honorable John R. Morris
No. 154700825

Brian E. Arnold and Lauren Schultz, Attorneys
for Appellant

Ryan J. Stanger and Melissa A. Aland, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1     A divorce in 2015 ended the twenty-two-year marriage of James J. Issertell Jr. and Tish Kristina Issertell. The district court ordered James to pay child support and alimony based on his level of income at that time. The next summer, however, James lost his job. Later that year, he petitioned for a modification of the divorce decree due to his military-service-related disabilities and lack of success in obtaining employment, despite ultimately applying for over 800 jobs. After a trial in 2018, the district court granted James's petition, concluding that James was involuntarily unemployed and setting new child-support and alimony

obligations. Tish appeals and contends that the court erred in determining James's income. We affirm.[1]

BACKGROUND[2]

¶2 In 2015, Tish and James's twenty-two-year marriage ended in divorce. At that time, James was working at L-3 Communications (L-3), earning a gross income of $8,670 per month. Based on James's level of income, the district court ordered him to pay $1,497 in child support and $2,500 in alimony per month.

¶3 In the summer of 2016, James was fired from L-3 due to comments he made about software changes and perceived ethics concerns during a company meeting. About a month later, he received a job offer from Woodbury Technologies (Woodbury), which was contingent upon Woodbury securing a contract for which it was competing. Woodbury ultimately did not obtain the contract, however, and James did not end up working there.

¶4 James thereafter continued to apply for jobs and petitioned the district court to modify the divorce decree based on his unemployment. In the time between the filing of his petition to

---

1. Because the parties have the same last name, we refer to them by their first names throughout this opinion with no disrespect intended by the apparent informality.

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the district court's findings, and therefore recite the facts consistent with that standard and present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Burggraaf v. Burggraaf*, 2019 UT App 195, n.2, 455 P.3d 1071 (cleaned up).

modify and the court's order granting it, James applied for over 800 jobs through numerous websites, including LinkedIn, ZipRecruiter, SimplyHired, Glassdoor, Indeed, Ladders, and CareerBuilder. James suffers from various disabilities related to his time in the United States military. Due to these disabilities, he experiences various health problems, the management of which requires several medications. A letter from the United States Department of Veterans Affairs (VA) states that James's disability rating is one hundred percent.[3] James also receives $3,698.32 per month from a disability payment provided by the VA.

¶5    Due to his conditions, James worked with the VA in a vocational-rehabilitation program. As part of a feasibility study—intended to place James in a job that would not aggravate his disabilities—the VA placed James in a job at the Salt Lake City Library working four-hour shifts three times a week at $11 per hour. This led to the VA paying for James to pursue a master's degree in information systems, which eventually caused James to leave the library position. However, due to his disabilities, James struggled to keep up with his studies.

---

3. A VA disability rating is based on the severity of the service-connected condition and represents how much a disability decreases one's overall health and ability to function. *See* 38 U.S.C. § 1155 (2018); 38 C.F.R. § 4.1 (2018) (explaining that the disability rating involves an "evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service" and that "[t]he percentage ratings represent as far as can practically be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations"); *About VA Disability Ratings*, U.S. Dep't of Veterans Affairs (February 7, 2020), https://www.va.gov/disability/about-disability-ratings/ [https://perma.cc/5LVV-NF6A].

¶6 In October 2018, the district court issued its order granting James's petition to modify his child-support and alimony obligations. The court concluded that James's situation qualified "as [a] substantial change in circumstances," that "was unforeseeable," and that James was involuntarily unemployed. Because of these conclusions and because both James's and Tish's respective net monthly incomes left them in the financial red, the court utilized the doctrine of equalization of income to reduce James's monthly child-support obligation to $796 and his alimony obligation to $131.

¶7 Tish appeals.

ISSUE AND STANDARDS OF REVIEW

¶8 Tish raises two contentions on appeal that ultimately amount to one broad issue: whether the district court properly determined James's income. First, Tish contends that "the court failed to properly impute income to [James] for the child support and alimony determination." Then, Tish contends that it was improper "to not consider any and all income including gifts when determining alimony."

¶9 "In divorce actions, a district court is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (cleaned up). Moreover, "a court's decision to impute income to a spouse, and its decision on the amount of income that ought to be imputed are each reviewed for an abuse of discretion." *Id.* ¶ 98; *see also Pulham v. Kirsling*, 2019 UT 18, ¶ 41, 443 P.3d 1217. Finally, we "review a [district] court's determination to modify or not to modify a divorce decree for an abuse of discretion. However, we review for correctness any challenges to the legal adequacy of findings of fact or to the legal

accuracy of the [district] court's statements underlying such a determination." *Nave-Free v. Free*, 2019 UT App 83, ¶ 8, 444 P.3d 3 (cleaned up).[4]

## ANALYSIS

¶10 In determining alimony, a district court is required to consider the enumerated factors in section 30-3-5(8)(a) of the Utah Code. Similarly, a district court must look to the Utah Child Support Act in determining child support. *See* Utah Code Ann. § 78B-12-205 (LexisNexis 2018). As part of these analyses, "courts in divorce cases may consider imputing income to an unemployed spouse in assessing the spouse's ability to produce income." *Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 10; *see also* Utah Code Ann. § 78B-12-203(8)(b) (dictating that imputed income "shall be based upon employment potential and probable earnings considering" various enumerated factors).[5]

¶11 "Although not required to impute income, a finding of voluntary unemployment or underemployment may be relevant" in the imputation analysis. *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 16, 437 P.3d 1257 (cleaned up); *see also Rayner v. Rayner*, 2013 UT App 269, ¶ 10 n.4, 316 P.3d 455 ("While the current statute no longer refers explicitly to a finding of voluntary unemployment or underemployment, . . . [such a finding] remain[s] relevant."

---

4. Tish does not dispute that James's situation constitutes an unforeseeable or substantial change in circumstances. *See* Utah Code Ann. § 30-3-5(8)(i)(i) (LexisNexis 2018). Therefore, we do not further address those issues.

5. "Although this section of the Utah Code addresses imputation for the purposes of child support, it is also relevant to imputation in the alimony context." *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 8 n.5, 437 P.3d 1257 (cleaned up).

(cleaned up)). "A spouse is voluntarily unemployed or underemployed when he or she intentionally chooses of his or her own free will to become unemployed or underemployed." *Rayner*, 2013 UT App 269, ¶ 7 (cleaned up). "A person who has been involuntarily terminated from a position may thereafter become voluntarily underemployed by not attempting in good faith to obtain new employment . . . or by refusing to accept suitable employment offers." *Busche v. Busche*, 2012 UT App 16, ¶ 21, 272 P.3d 748 (cleaned up). In connection with this inquiry, we examine "what the spouse has done in the aftermath of [the] termination to determine whether he or she has become voluntarily underemployed by virtue of his or her failure to then make reasonable efforts to obtain employment at a pay rate comparable to that of the lost employment." *Rayner*, 2013 UT App 269, ¶ 8 (cleaned up). An imputation analysis also involves consideration of the unemployed spouse's employment capacity and earning potential. *Id.* "Employment capacity involves consideration of the spouse's abilities and limitations, qualifications, experience, and skills." *Id.* (cleaned up).

¶12　However, income may not be imputed "in contested cases" unless the district court "enters findings of fact as to the evidentiary basis for the imputation." Utah Code Ann. § 78B-12-203(8)(a). And "if the district court were to take the discretionary step of imputing income, the imputation would have to be based upon evidence related to employment potential and probable earnings." *Pulham v. Kirsling*, 2019 UT 18, ¶ 41, 443 P.3d 1217; *see also Busche*, 2012 UT App 16, ¶ 22 ("At a minimum, the [district] court must determine [an individual's] employment capacity and earnings potential before it can logically conclude that he is, in fact, underemployed." (cleaned up)).

¶13　Here, the district court exercised its discretion to decline to impute James's previous L-3 level of income to him; the court based its decision on James's disabilities and unsuccessful efforts to obtain gainful employment. Tish argues that "the court did not

evaluate [James's] job skills, abilities, and current earnings," and Tish highlights facts favorable to her position such as the job offer James received from Woodbury, his work at the Salt Lake City Library, and his testimony that he studied for forty hours a week in his attempt to obtain a master's degree. But this argument crumbles under the weight of careful scrutiny because the court, in fact, analyzed those details.

¶14 To start, the court did evaluate James's skills and abilities, and it specifically concluded that imputation of his previous level of income was not warranted:

> 6. [James] is currently involuntarily unemployed in that since his firing, he has made every effort to network, apply for jobs, interview for jobs, become a better candidate for jobs, yet has failed to secure any offers of employment.
>
> . . . .
>
> 9. Imputation to [James] of income beyond $3,698.32 is improper because [James] has made good-faith efforts to secure remunerative employment since his job was terminated and his ability to work based upon his disabilities renders it impossible for him to earn the income which he earned until he was fired.

¶15 In so concluding, the court noted James's specific disabilities and that James "has applied for more than [800] jobs, and he has attended all interviews that he secured." The court relied on the VA's letter rating James's disabilities as one hundred percent. The court also noted James's master's degree studies and his vocational rehabilitation through the VA as not being bases to impute the requested income to James. *See infra* ¶¶ 17–18. Thus, the court considered both James's abundant efforts to obtain a job

and his lack of employment capacity due to his disabilities in coming to its conclusion. *See Rayner*, 2013 UT App 269, ¶ 8.

¶16    In bringing up James's job offer from Woodbury, Tish's argument fails to mention that James never ended up working in that position because the job offer was contingent upon Woodbury securing a contract it was in competition for and did not receive. The argument also loses its persuasive value when we consider the chronology of James's occupational efforts. Woodbury extended its job offer to James about a month after he was fired from L-3 in the summer of 2016, which was two years before the court granted James's petition to modify. In the meantime, James networked with former work colleagues, applied for over 800 jobs, and did not receive a single job offer, which the court characterized as his "good-faith efforts." Thus, the Woodbury job offer told the court very little about James's efforts and employment capacity when the additional evidence was brought to light at the evidentiary hearing.

¶17    The district court was also well-aware of James's work at the library, which was part of a feasibility study with the VA, was intended to place James in a job that would not aggravate his disabilities, and led to the VA paying for his master's degree studies. Simply put, it was reasonable for the district court to view the position at the library as an atypical employment arrangement for vocational rehabilitation upon which there was an insufficient basis to impute James's previous level of income to him, given the position's temporary and rehabilitative qualities.

¶18    And Tish's argument that James should be imputed the income because he testified that he studied forty hours per week neglects the other half of that scholastic story, namely the difficulties James was having with his studies. The court noted these difficulties, demonstrating that his studies were not a basis to impute income:

20. [James] has a processing disorder when reading that requires him to receive an accommodation software for school to be able to listen to his textbooks.

21. [James] receives an accommodation at school to have someone take notes for him because he cannot maintain focus and concentration throughout his classes.

22. [James] has several incompletes at school from not being able to keep up with the assignment schedule.

¶19　In short, Tish's argument that the district court did not evaluate James's skills and abilities is unpersuasive because the court did not ignore the facts that Tish highlights; rather, the court determined that the evidence was persuasive in James's favor instead of Tish's. *See Nave-Free v. Free*, 2019 UT App 83, ¶ 10, 444 P.3d 3 (explaining that "merely pointing to evidence that might have supported findings more favorable" is unpersuasive and that a party instead "must identify flaws in evidence relied on by the [district] court" (cleaned up)).

¶20　In her final point related to imputation of income, Tish argues that the district court should have imputed income to James at "the federal minimum wage for a 40-hour work week." But this issue is unpreserved.

¶21　"Parties are required to raise and argue an issue in the [district] court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443 (cleaned up). "When a party fails to raise and argue an issue in the [district] court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *Id.* ¶ 15. "[O]ur case law draws a

distinction between new 'issues' (like distinct claims or legal theories) and new 'arguments' in support of preserved issues (such as the citation of new legal authority)." *Hand v. State*, 2020 UT 8, ¶ 6. We have previously explained that not all issues related to imputing income are preserved merely because the topic of imputing income is in dispute. *Vanderzon v. Vanderzon*, 2017 UT App 150, ¶¶ 37–38, 402 P.3d 219 (holding that whether the district court "erred by imputing too much income" to a party was not preserved because "[w]hile the court's own findings and orders indicate[d] that the court considered the components of an alimony determination, they d[id] not demonstrate that the court considered the particular" issues raised on appeal).

¶22    In this case, the record indicates that Tish proceeded with an all-or-nothing approach at the district court level: she sought solely that the court impute income to James at the level of his previous income at L-3. She did not once, throughout the entire course of the modification proceedings, raise or even tangentially address a claim or theory that James should be imputed a different level of income (e.g., minimum wage or the level of income at his part-time library job). Even Tish's proposed order submitted to the court lacked any reference to imputing income of minimum wage or anything lower than James's previous salary at L-3.[6] Therefore, Tish failed to preserve the theory she now propounds on appeal: that the court erred by not imputing a lower level of income to James.[7]

---

6. To the extent that Tish argues for other levels of income to be imputed, which is unclear from her briefs on appeal, those issues are unpreserved for the same reasons.

7. We see no valid exception to the preservation rule here, nor does Tish argue one. *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443.

¶23  Next, Tish argues that "equalization of poverty was not appropriate when there [was] money available to pay the alimony obligation." Her premises for this conclusion are that James's current wife has been "paying all his monthly obligations other than alimony and child support[,] . . . there were no written agreements between them that he would ever pay her back[, and t]herefore, these were gifts and should be considered as part of his gross income in being able to pay his alimony obligation." But this argument is unsound.

¶24  "Equalization of income, which is perhaps better described as equalization of poverty, is a [district] court's remedy for those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs." *Keyes v. Keyes*, 2015 UT App 114, ¶ 39, 351 P.3d 90 (cleaned up).[8] In setting alimony, "[t]he court may consider the subsequent spouse's financial ability to share living expenses." Utah Code Ann. § 30-3-5(8)(i)(iii)(A) (LexisNexis 2018).

¶25  Here, the district court did take into account the financial contributions of James's current wife. It noted that James's "monthly expenses are listed at $5,446.43. This figure already takes into account [James's] new wife sharing in the household expenses and she is not expected to pay all of [James's] expenses."

¶26  The court also noted that James and his current wife have drained their savings accounts completely and have borrowed from his wife's retirement account in trying to meet James's obligations under the divorce decree. And there was testimony that James had an agreement to pay his current wife back,

---

8. The district court noted the parties' respective monthly income shortfalls in invoking the doctrine. James's expenses are $5,446.43, and his income is $3,698.32. Tish's expenses are $5,088.70 with a monthly income of $2,407.

providing the district court an evidentiary basis to conclude that the money was not a gift. *See Jones v. Cook*, 223 P.2d 423, 425–26 (Utah 1950) ("A clear and unmistakable intention on the part of the donor to make a gift of h[er] property is an essential requisite of a gift inter vivos." (cleaned up)). Even if this testimony didn't exist, the court could not base its prospective order on past gifts that have no assurance of being continued because James's current wife has no legal obligation to continue providing the monetary support that she has in the past. Therefore, Tish's argument that the district court erred in not concluding that the financial contributions were endlessly perpetual gifts is unavailing.

CONCLUSION

¶27   We conclude that the district court did not abuse its discretion in determining James's income and in granting his petition to modify the divorce decree.

¶28   Affirmed.

───────────