**2024 UT App 125**

# THE UTAH COURT OF APPEALS

LUTISHA MERRILL,
Appellee,

*v.*

JOHN RICHARD MERRILL,
Appellant.

Amended Opinion*
No. 20210785-CA
Filed September 6, 2024

Third District Court, Silver Summit Department
The Honorable Teresa L. Welch
No. 194500031

Luke A. Shaw and Jill L. Coil,
Attorneys for Appellant

Julie J. Nelson, Attorney for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1    John Richard Merrill appeals from the district court's final
order resolving issues related to his divorce from Lutisha Merrill.

---

* This Amended Opinion replaces the Opinion in Case No.
20210785-CA issued on July 11, 2024. After that opinion issued,
the appellee filed a petition for rehearing, and we called for a
response. We grant the petition and issue this revised opinion to
reflect our conclusion on rehearing that the issue addressed in
part II.C of our Analysis was not preserved for appellate review.

John[1] challenges several of the court's decisions related to its calculation of the parties' incomes, its determination of Lutisha's reasonable expenses, its alimony award, and its valuation and division of the marital estate. We affirm most of the district court's challenged decisions. On the issue of Lutisha's tax rate, however, we vacate the district court's decision and remand the case for additional proceedings consistent with this opinion.

BACKGROUND

*The Marriage*

¶2    Lutisha and John were married in 2001 and had twins together in 2007. Lutisha filed for divorce in 2019.

*The Parties' Employment and Incomes*

¶3    During their marriage, the parties were able to sustain a comfortable standard of living through their substantial incomes. Lutisha has significant experience in advertising and radio advertising sales. From 2011 to 2014, she worked as the vice president of sales for a large media company, earning an average of $168,730.00 annually. In 2014, she left that position and formed her own business, 360 Touch LLC (360 Touch), a "full-service advertising agency." As part of her business practice, Lutisha paid for expenses, including advertising for her clients, on a business credit card that earned frequent flyer miles, which resulted in her earning between 1.5 million and 1.8 million miles during both 2019 and 2020. In the years leading up to the COVID-19 pandemic, 360 Touch grew significantly; however, with the onset of the pandemic in 2020, the business "experienced a 37% decline in

---

1. As is our practice, because the parties share the same last name, we refer to them by their first names, with no disrespect intended by the apparent informality.

revenue," and Lutisha's income "declined 42%" from the prior year.

¶4      John was employed at the time of trial as the chief financial officer of a publicly traded software company. He had a base annual salary of $225,000.00, with quarterly bonuses of up to 50% of his salary. His contract at the time of trial also provided for nearly $100,000.00 worth of restricted stock shares, a third of which was set to vest in each of May 2020, May 2021, and May 2022.

*The Family Homes*

¶5      The parties owned two homes that were purchased during their marriage—their primary home in Park City (the Park City property) and a vacation home in Coalville (the Coalville property). Upon separation, Lutisha remained in and maintained the Park City property while John maintained the Coalville property, although he also rented an apartment in Park City to live closer to the children. According to Lutisha, at the time John moved out of the Park City property, the parties "knew that the home desperately needed a new roof . . . , new carpet . . . , [and] new interior paint . . . and that the exterior wood was rotted and needed to be replaced." The court found that Lutisha paid for the roof to be replaced in May 2020 at a cost of $18,380.00.

*The Parties' Financial Declarations*

¶6      As the parties prepared for trial, they provided various financial declarations. Lutisha's final amended financial declaration listed current monthly expenses totaling $26,489.57 and marital monthly expenses of $27,183.89. Relevant to this appeal, these expenses included line items for minimum credit card payments ($1,322.50), additional credit card payments ($2,000.00), personal loan payments ($970.00), real estate maintenance ($1,792.84), food and household expenses ($4,580.70), clothing expenses ($229.83), entertainment/travel

expenses ($696.84), health care expenses ($1,054.67), and divorce legal fees ($5,375.20). John's final amended financial declaration listed his current monthly expenses at $21,518.85 and marital monthly expenses of $30,973.02. His declaration included a line item for monthly legal expenses of $3,233.66.

*The Divorce Trial*

¶7     Trial was held remotely in May and June of 2021.[2] The parties agreed to rely on prepared declarations from Lutisha and John in place of direct examination, while still allowing for a real-time opportunity for cross-examination of each party.

*Lutisha's Testimony*

¶8     Lutisha's testimony was presented first. As to her income, she testified regarding the pandemic's negative impact on 360 Touch and some of the steps she had taken to try to mitigate that impact. She testified, "[A]ny time that's not taken by a client with a specific project, I now spend cold-calling and working on the business." She estimated that at the time of trial she was "cold-calling 30 minutes to an hour every day." She also explained that shortly before the pandemic, her full-time assistant reduced her hours to part time and that although Lutisha had intended to hire a second part-time assistant, she did not do so. Additionally, she identified the following actions she took to mitigate the impact of the pandemic on her business: "I also closed my office, which was very difficult for me. I enjoyed having an office. And I worked with my different vendors to decrease what I was paying them as

---

2. Prior to trial, in September 2020, the parties entered into a stipulation that "resolved the issues of child custody, parent time, number of overnights for purposes of calculating child support . . . , payment of the children's expenses, the claiming of the children on taxes, and other more minor issues." None of these issues are relevant to this appeal, and we therefore do not discuss them further.

far as subscription services, those types of things. I've done everything possible to create revenue while managing my expenses." As to the possibility of returning to a radio sales manager position similar to the position she had before forming 360 Touch, Lutisha said that such jobs "don't exist anymore." She explained, "I have spoken to all of the general managers of the different radio companies in town, and their current situation is they're actually getting rid of sales managers. They are terminating people because of the situation their companies are in due to COVID."

¶9 Lutisha testified that she had struggled to pay her expenses during the pandemic and that her economic situation had forced her to take out a personal loan of $100,000.00 to make ends meet. She testified, "That money went to pay my personal expenses. My mortgage, my car, my food, utilities. It went to pay for everything."

*John's Testimony*

¶10 John's testimony was presented next. Regarding his income, John testified about his employment agreement. He acknowledged his $225,000.00 base annual compensation as well as the potential for quarterly bonuses. And he said that although he considered the stock shares to be part of his compensation package, he did not "rely on those numbers in planning [his] life," explaining, "I know that . . . whether it's stock options or restricted shares, there is a vesting period and a holding period and you can't sell those shares until sometime in the future."

*Lutisha's Expert Evidence*

¶11 Each party also presented the testimony of a financial expert, along with prepared financial expert reports, to help establish income amounts for the parties. Lutisha's expert had determined Lutisha's income from 360 Touch by calculating her average monthly incomes for both 2019 and 2020, "presenting the

two calculations . . . to show the impact of the COVID-19 pandemic on [Lutisha's] earnings." Those calculations showed an average monthly income in 2019 of $19,555.00 and an average monthly income in 2020 of $10,316.00. Lutisha's expert concluded:

> COVID-19 has had a significant negative impact on 360 Touch and the Advertising Agencies industry. 360 Touch's sales in 2020 decreased by 37.43 percent compared to 2019. Our analysis of 360 Touch's 2020 sales shows that many of the Company's clients have significantly decreased their marketing spending compared to historical expenditures. [Lutisha] informed us that this decrease is caused by decreased demand caused by uncertainty from the impacts of COVID-19. [Lutisha's] assertion is consistent with industry data . . . .

Lutisha's expert then quoted from a nationwide report stating that "[r]evenue for the Advertising Agencies industry is anticipated to decline 10.2 percent in 2020 due to reductions in ad spending" and that "[h]igh levels of uncertainty tend to reduce consumer and business spending." Lutisha's expert's report also included calculations showing growth projections for 360 Touch. The calculations showed a 25% loss in 2021, 20% growth in 2022, and 2.4% growth thereafter.

¶12 Lutisha's expert also calculated an average monthly income for John in both 2019 and 2020. In addition to John's wages, this calculation relied on various company-related benefits, such as 401(k) contributions, health savings account contributions, and vested common stock. Lutisha's expert testified that it was important to include the vested stock in John's income "[b]ecause it's wealth that's generated through his work effort." The result was an average monthly income of $25,922.00 in 2019 and $27,708.00 in 2020.

¶13 Lutisha's expert testified generally as to the type of stock issued to John, unregistered restricted common stock shares (RSUs):

> They have additional limitations on trading when the shares are held by an affiliate or an insider like [John]. So in order to sell those shares, you have to hold them for a certain period of time, but you also have to submit forms that indicate your intent to sell, and then . . . depending on what the limitations are on selling shares of a particular company that you own shares in, you may have to hold those shares for additional periods.

However, when asked, Lutisha's expert was not able to elaborate on the specific restrictions applicable to John's stock, responding, "Well, it really varies significantly from one company to another and one stock program to another. And so . . . there aren't general parameters that I could give you. But RSUs that I've seen vary dramatically as to how the insiders can trickle shares into the stock market."

¶14 During cross-examination, Lutisha's expert was questioned as to whether, "based upon standard practice in [his] profession," he counts frequent flyer miles "as a monetary value when computing income." Lutisha's expert responded, "I don't, no."

*John's Expert Evidence*

¶15 John also retained a financial expert. In March 2020, John's expert had conducted a valuation analysis of 360 Touch. This analysis had projected that for 2020, 360 Touch "would have over $2,000,000 in revenue . . . and would generate $176,000 in salary to [Lutisha], plus another $37,000 in net income to [Lutisha]." However, John's expert acknowledged at trial that by the 2021 trial dates, actual 2020 numbers were known and instead showed

that the real "results for 360 Touch in 2020 were just under $1.6 million in revenue," a "$121,000 payroll to [Lutisha]," and "a small net loss." He conceded that "in hindsight," it appeared that his projection for 2020 was probably "overstated by over 43 percent."

¶16　John's expert provided another report in March 2021, which specifically addressed Lutisha's earning potential. This analysis relied on an industry research report[3] of advertising agencies in 2020—a report "related to the advertising industry as a whole"—to project a "monthly net income after taxes . . . of $13,774 for 2020, and $14,466 for 2021." Upon cross-examination, John's expert acknowledged that his information was "not specific to 360 Touch's customer base," that he was not "aware of the impact political advertising had on the advertising world in 2020" (a factor with potential to have had an outsized impact on such data in an election year, like 2020), and that he did not "have any data on single-person advertising agencies in Utah and the impacts the pandemic ha[d] had on those agencies."

¶17　Unlike Lutisha's expert, John's expert *did* include Lutisha's frequent flyer miles in his analysis of her earnings, explaining that although frequent flyer miles may not have "an actual cash value," they "could be turned into . . . personal spending or business spending so they actually have a value." He also considered the level of rewards in this case to not be "typical" because he had not previously "seen this level of rewards . . . where someone is able . . . to amass this amount of $1.5 million in spending on a credit card." However, when questioned as to the standard in his profession, he conceded that monetizing frequent

---

3. This report was created by IBISWorld, which describes itself as a global company that "provides trusted industry research on thousands of industries worldwide." *IBISWorld's Story*, IBISWorld, https://www.ibisworld.com/company/our-story/ [https://perma.cc/N3PY-Z77A].

flyer miles as income was "typically . . . not done." And on cross-examination he also conceded that he usually follows this standard and does not "typically include rewards points in the valuation of income."

*The Post-trial Proceedings*

¶18 After the conclusion of the trial, the district court issued its Findings of Fact and Conclusions of Law and Order. Lutisha thereafter filed a motion to reconsider and amend the findings, requesting changes to the court's order to address alleged inconsistencies therein and requesting additional findings regarding the court's property division. John responded to that motion and also counter-requested "correction or reconsideration" of a number of items, highlighting various "other discrepancies" in the court's order. After holding a clarification hearing, the court entered an Amended Findings of Fact and Conclusions of Law and Order. The court then entered its Decree of Divorce.

¶19 The district court's amended order was forty-two pages long and addressed a multitude of issues. We confine our recitation here to only those issues relevant to this appeal.

*The Court's Determination of the Parties' Incomes*

¶20 First, the court determined the gross monthly income for each party. The court reviewed the testimony presented by both experts and then found that "[Lutisha's expert's] analysis and opinion regarding [Lutisha's] income [was] more credible than [was John's expert's]." The court explained that this was because John's expert had relied on national projections as opposed to more localized data, had made projections based on data from an election year without knowing the impact of political advertising on such data, had relied on financial information compiled by John as opposed to the actual financial records of Lutisha and 360 Touch, and had made extrapolations predicting Lutisha's income

that ultimately significantly overstated Lutisha's actual income for 2020. Thus, the court adopted Lutisha's expert's income calculation and set Lutisha's monthly gross income at $10,316.00.

¶21 As to John's argument that a higher income should be imputed to Lutisha based on her historical earnings, the court determined that John had not shown that Lutisha was voluntarily underemployed or that, with reasonable effort, she could be earning more. The court found that John did not present testimony regarding what jobs were locally available to an individual with Lutisha's background, and the court found credible Lutisha's assertions that the type of marketing positions she had held previous to starting her own business were no longer available and that she had made reasonable efforts to maintain her income in the face of pandemic-related challenges.

¶22 As to John's gross income, the district court again relied on Lutisha's expert's testimony, "which was based on [John's] wages, bonuses, 401(k) contributions, Section 125 Benefits,[4] Health Savings Account Contributions, Group Term Life Insurance Benefit and Vested Common Stock" to determine a monthly gross income amount of $27,708.00. Although John had argued that, at least for purposes of calculating child support, the stock should not be considered as part of his gross monthly income, the court disagreed. The court reasoned that John's "employment contract and work/payment history indicate[d] that [John] regularly receives stock options and bonuses as part of his regular income/compensation" and that "including [John's] bonuses and regularly received stock options as part of his income is consistent with the sources of income as outlined in Utah Code

---

4. Lutisha's expert explained these benefits as follows: "They are generally the purchased cafeteria plan benefits. They're just a selection of benefits that the IRS allows employers to offer to their employees on a pretax basis."

§ 78B-12-203(1)." *See generally* Utah Code § 78B-12-203(1) (defining "gross income" for purposes of the Utah Child Support Act).

*The Alimony Order*

¶23    Next, the district court addressed alimony. The court initially recognized that the following facts were indicative of the parties' standard of living during the marriage: "the family traveled regularly, they maintained a second home, they enjoyed outdoor activities (and had recreational vehicles to do so), they dined out regularly, they had a nanny to care for the children, they skied at Deer Valley and Park City Mountain Resort, and they contributed to retirement savings." As a result, the court accepted John's marital monthly expenses figure of $30,973.02. Based on these facts, the court determined that, with the exception of the line items for monthly legal expenses, the parties' listed expenses were "reasonable in light of the marital standard of living and in light of [the other party's] monthly needs." With the removal of the attorney fees expenses (and an adjustment to John's child support expense due to a change in the ordered child support amount), Lutisha was left with a total monthly expense amount of $21,114.80, and John was left with a total monthly expense amount of $19,118.19.

¶24    The court then determined that Lutisha's net monthly income of $7,846.00—the amount left of her gross monthly income after considering her tax rate, "[b]ased upon [her] 2020 tax return" of "19% federal and 4.95% state"—was insufficient to meet her reasonable needs and left a monthly shortfall of $13,268.80. And the court determined that John's net monthly income after taxes of $19,409.00 was sufficient to cover his expenses, leaving a surplus of $290.81. The court then applied that surplus to Lutisha's shortfall and, thereafter, "[e]qualizing the poverty," split the remaining shortfall between the two parties. This resulted in a monthly alimony amount of $5,529.31, which the court ordered John to pay for five years, allowing Lutisha "to

maintain the marital standard of living until the [m]inor [c]hildren reach the age of majority, and . . . allow[ing] [Lutisha] sufficient time to rehabilitate her income."

*The Property Division*

¶25 The district court then moved to the task of dividing the marital estate, valuing the estate as of the time of trial. As to real property, the court awarded the Park City property to Lutisha and the Coalville property to John. Regarding the furniture in the homes, the court stated that because "credible trial evidence" showed that the Park City property and the Coalville property had "comparable items that are comparable in value," it was "reasonable and equitable" to award Lutisha the "furniture, personal property, and the like" at the Park City property and to award John the "furniture, personal property, and the like" at the Coalville property.

¶26 The district court then awarded certain accounts and other property to Lutisha and John respectively. Relevant to this appeal, the court awarded the following to John: (1) two sets of stock options received as compensation from his employer, one valued at $99,198.00 and another valued at $99,996.75; (2) his 2021 first quarter bonus of $28,125.00; (3) a "travel credit" of $15,426.57 for a canceled trip to Bora Bora, with the court noting that although John "received a refund for the travel, the refund is not reflected anywhere else and thus should be included in the division of property"; and (4) the furniture that John had somewhat recently purchased for his Park City apartment, at a value of $26,318.86.

¶27 In dividing the marital estate, the district court declined John's request to award him reimbursement for half of the $62,304.63 that he contended he spent on maintaining marital property and paying related expenses. The court determined that John "did not provide credible evidence that these were in fact marital expenses," and it identified examples of listed items that "[did] not appear to be marital expenses," such as "clothing

purchases, contact lenses, Weller Recreation, and Marine Products."

¶28 The district court did, however, determine that the $100,000.00 personal loan obtained by Lutisha was part of the marital estate because the loan was used "to pay for legitimate marital expenses." In making this determination, the court pointed to, among other things, Lutisha's "financial condition at that time" (when her income "had dropped significantly" and John "was under-paying his child support obligations") and the parties' "historical spending practices."

¶29 The district court then divided the remaining marital property and debts. Finally, the court ordered an additional $102,243.09 equalization payment from John to Lutisha.

ISSUES AND STANDARDS OF REVIEW

¶30 John now appeals. He first challenges several components of the district court's calculation of the parties' incomes. "Courts have broad discretion to select an appropriate method of assessing a spouse's income, including determinations of income imputation." *Bond v. Bond*, 2018 UT App 38, ¶ 6, 420 P.3d 53 (cleaned up). When challenging an income determination, "appellants bear a heavy burden, and we can properly find abuse [of discretion] only if no reasonable person would take the view adopted by the trial court." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (cleaned up).

¶31 John also challenges several of Lutisha's expenses that the district court found to be reasonable, the court's method of calculating alimony, and the court's division of the marital property. "In a divorce proceeding, the trial court may make such orders concerning property distribution and alimony as are equitable. The trial court has broad latitude in such matters, and orders distributing property and setting alimony will not be

lightly disturbed." *Olsen v. Olsen*, 2007 UT App 296, ¶ 8, 169 P.3d 765 (cleaned up). "Therefore, we review [property distribution and] alimony awards under an abuse of discretion standard." *Id.*

ANALYSIS

I. The Parties' Incomes

A.     Imputation of Income to Lutisha

¶32     John argues that the district court abused its discretion in determining Lutisha's gross income. Specifically, he challenges the district court's refusal to impute wages beyond the $10,316.00 monthly income calculated by Lutisha's expert.

¶33     As an initial matter, we note that in determining Lutisha's income, the district court referenced outdated law when it cited *Busche v. Busche*, 2012 UT App 16, 272 P.3d 748, *cert. denied*, 280 P.3d 421 (Utah 2012), for the proposition that "[t]he court must find that the spouse is voluntarily unemployed or underemployed" before it may impute income. *Id.* ¶ 24. While such a finding *was* a statutory prerequisite to imputing income prior to 2007, "the current version of the Utah Code requires only that the judge 'enter[] findings of fact as to the evidentiary basis for the imputation.'" *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 14, 508 P.3d 612 (alteration in original) (quoting Utah Code § 78B-12-203(8)(a)). "Thus, while voluntary unemployment or underemployment may be relevant when considering whether a party is concealing income or shirking in his or her efforts to earn income, a finding of voluntary unemployment or underemployment is not a prerequisite to imputing income." *Id.* (cleaned up). Instead, "the focus of the imputation analysis is on the detailed findings of fact necessary to support a decision to impute income rather than the ultimate fact or legal conclusion of voluntary unemployment or underemployment." *Id.* (cleaned up).

¶34　Notwithstanding the district court's reference to the outdated rule cited in *Busche*, the court's analysis was ultimately based on the correct concern—whether there was sufficient evidence to support imputation of a higher income to Lutisha. The court determined there was not because John presented no evidence "as to the current salaries or job availability in the prevailing market for persons with backgrounds similar to [Lutisha's] or what [Lutisha's] employment capacity and earnings potential would be in the prevailing markets in the community."

¶35　Although John's expert testified that Lutisha had a higher income potential than what Lutisha's expert testified to, the court determined that John's expert's analysis was less credible than Lutisha's expert's analysis because John's expert "relied on projections at the national level, but he had no data for single-person advertising agencies in Utah and the impacts of COVID-19 on a single-person agency." The court also noted that the national numbers on which John's expert relied were election-year numbers and that John's expert "conceded that he had no knowledge of the impact of political advertising on the media industry numbers at the national level." Additionally, the court observed that John's expert "relied on [John's] self-created spreadsheets for his financial analysis rather than on the actual billing and financial records for 360 Touch and [Lutisha] from 2020." Indeed, the court found that the revenue projections John's expert had made for 360 Touch for 2020 were "overstated by over 43% compared to the actual numbers" that were available for that year.

¶36　The court determined that the income analysis of Lutisha's expert was more credible, as it was based on "income tax returns for [Lutisha] and 360 Touch, and on accounting records for 360 Touch." After analyzing these records, Lutisha's expert opined that "360 Touch has experienced a 37% decline in revenue since 2019, and that [Lutisha's] income has declined by 42% from 2019." The district court also found that Lutisha "credibly testified that

marketing jobs (like the one she held prior to starting 360 Touch) are no longer available" and that she "provided credible testimony that she made reasonable efforts to maintain her income despite the negative impacts of the COVID-19 Pandemic on 360 Touch."

¶37   John challenges the district court's credibility assessments and evidentiary findings, specifically arguing that Lutisha's testimony regarding the availability of marketing jobs "cannot be taken as credible or as a basis for an implication that no jobs exist," that she "had not made good faith or reasonable efforts to mitigate the loss of her income," and that she operates her business "without structure or good business practices." But "[i]t is the province of the trier of fact to assess the credibility of witnesses, and we will not second-guess the trial court where there is a reasonable basis to support its findings." *Reed v. Reed*, 806 P.2d 1182, 1184 (Utah 1991); *see also* Utah R. Civ. P. 52(a)(4) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses."); *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 27, 176 P.3d 476 ("The trial court considered conflicting evidence on this point and rejected [the husband's] explanation in favor of [the wife's]. We defer to the trial court's assessment of the credibility of this testimony."). "If there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 27, 540 P.3d 727 (cleaned up). John has shown no such fatal flaw. Instead, our review of the evidence reveals a reasonable evidentiary basis supporting the district court's factual findings on this issue, and we therefore see no abuse of discretion in the court's refusal to impute a higher income to Lutisha.

¶38    John also argues that the district court should have considered "expected growth" of 360 Touch. However, the district court was of the opinion that the expected growth asserted by John's expert was not sufficiently supported, which is understandable given that John's expert projected an increase in Lutisha's income for 2020 that ended up being 43% higher than the actual growth in Lutisha's income for that year. And although Lutisha's expert testified that "[i]ndustry-wide the projection is for growth," he emphasized that this projection was, indeed, an industry-wide projection and "not specific to [Lutisha's] company."

¶39    John counters that even Lutisha's expert "projected growth of 20% starting in 2022" for 360 Touch and that such growth "means that [Lutisha will] regain all her lost income by 2024." But the projection to which John refers first shows a 25% *retraction* in 2021. And although the projection does predict a 20% growth in 2022, it does not support John's assumption that a 20% growth rate would continue each year thereafter. Indeed, that projection's predicted growth rate for the following years was only 2.4%, not a continued 20%.

¶40    In light of all this, the district court did not abuse its discretion by declining to base its income calculations on such varying and uncertain projections and instead leaving it to the parties to seek modification of the court's orders if either of their incomes were to substantially change in the future. *See Johnson v. Johnson*, 855 P.2d 250, 253–54 (Utah Ct. App. 1993) (reasoning that "if a trial court knows that a party will be receiving additional future income[,] it should make findings as to whether such additional income will affect the alimony award," but recognizing that if future income is "too speculative at the time of trial," the court may delay that determination and a party can "bring a modification proceeding at the appropriate time"). *See generally* Utah Code § 30-3-5(11)(a) ("The court has continuing jurisdiction to make substantive changes and new orders regarding alimony

based on a substantial material change in circumstances not expressly stated in the divorce decree or in the findings that the court entered at the time of the divorce decree."); *id.* § 78B-12-210(9) ("A parent, legal guardian, or the [Office of Recovery Services] may at any time petition the court to adjust the amount of a child support order if there has been a substantial change in circumstances. . . . [A] substantial change in circumstances may include . . . material changes of 30% or more in the income of a parent . . . .").

### B. Calculation of Lutisha's Tax Liability

¶41 John contends that the district court's calculation of Lutisha's tax liability was improper, resulting in a net income for her that was lower than it should have been. The district court found that "[b]ased upon [Lutisha's] 2020 tax return, her tax rate is 19% federal and 4.95% state." John correctly observes, however, that calculations based on Lutisha's 2020 tax return show that she actually paid an overall federal tax rate of approximately 13% and an overall state tax rate of approximately 4.8% in 2020. Thus, John asks for a "correction of the numbers to appropriately reflect the underlying source" and a resulting correction to "the corresponding calculations for alimony."

¶42 Lutisha, on the other hand, defends the tax rates the district court applied to her income. In doing so, she correctly observes that when the standard federal tax rates for 2020 are applied to her current gross monthly income as found by the district court, the result is an overall federal tax rate of 19%; that Utah's single-person tax rate for 2020 was 4.95%; and that these rates match the rates that the district court applied to her income. She also asserts that although John is correct in his calculations based on numbers derived from her 2020 tax return, the income number on that return "included more than just her earnings"—"[i]t also included $70,000 she withdrew from an IRA that year." For these reasons,

Lutisha asks us to affirm the district court's application of a 19% overall federal tax rate and a 4.95% state tax rate to her income.

¶43    In short, Lutisha presents a *plausible* basis for the tax rates the district court actually applied to her income, but it is squarely at odds with the *stated* basis for the rates the court said it would apply to her income. And we are without a reasoned basis upon which to resolve the inconsistency in the court's ruling. Accordingly, we vacate the court's ruling as to the tax rates to be applied to Lutisha's gross income, and we remand the case for the district court to clarify its ruling on this point and, if necessary, to adjust its net income and alimony calculations accordingly. *See generally Wight v. Wight*, 2011 UT App 424, ¶¶ 29–30, 268 P.3d 861 (remanding "for clarification" where an aspect of the trial court's ruling on division of the marital estate "appear[ed] to be internally inconsistent" and the court of appeals was "unable to determine which result the trial court intended"), *cert. denied*, 280 P.3d 421 (Utah 2012).

C.    Non-inclusion of Lutisha's Frequent Flyer Miles

¶44    John argues that the district court abused its discretion in failing to account for the large number of frequent flyer miles that Lutisha accrues each year. He argues that the court should have included the value of the miles in her income or, at the very least, used that value to reduce her expenses. We see no abuse of discretion in the court's treatment of the frequent flyer miles.

¶45    As for not including the frequent flyer miles in its calculation of Lutisha's income, this was consistent with the testimony of each party's financial expert. Lutisha's expert testified that "based upon standard practice in [his] profession," frequent flyer miles are not counted "as a monetary value when computing income." And while John's expert did include the frequent flyer miles in his earnings analysis, he conceded that he does not "typically include rewards points in the valuation of income." Although John believes that the court should have

treated Lutisha's frequent flyer miles differently due to the unusually high number of them, we decline to classify as an abuse of discretion the court's decision to adhere to the only generally accepted accounting approach for which evidence was received, even in this somewhat unusual situation.[5]

¶46 Moreover, even if the frequent flyer miles were to be classified as a source of income, Utah "caselaw directs district courts to *consider* all sources of income when determining alimony[;] it does not dictate that all sources of income be *counted* as income received by a spouse for that purpose." *Eberhard v. Eberhard*, 2019 UT App 114, ¶ 21, 449 P.3d 202. A district court retains "broad discretion to treat sources of income as the court sees fit under the circumstances." *Id.* Here, as Lutisha points out, the frequent flyer miles were "not used to offset any of the expenses [she] reported on her financial declaration or that the

---

5. John suggests that the district court improperly "refused to allow [his expert to testify] on facts and circumstances of this case that would warrant deviating from the standard practice in [the expert's] profession." This statement mischaracterizes the court's action. The court only refused to allow testimony as to other cases, not as to the circumstances of this case:

> I don't want [John's expert] talking about other cases that are not this case. What I want him to talk about, though, is general principles that are applied in his profession, in his expertise in terms of how travel benefits would be incorporated, how they're incorporated, and how he applied those principles to this case. So . . . I am permitting that. . . . But I'm not going to permit him to talk about other cases . . . because that is outside the scope.

Under this ruling, John's expert was free to present general principles for the treatment of frequent flyer miles when the number of miles at issue is unusually high. Yet he provided no such principles.

court found to be her expenses." The expense category for which frequent flyer miles would almost certainly have been used to offset expenses was Lutisha's entertainment/travel expenses category, and her declared monthly expenses for that category amounted to $696.84. This amount was supported by financial statements showing that Lutisha spent $10,452.60 out of pocket over a fifteen-month period—for a monthly average of $696.84—in the entertainment/travel category. Because this expense amount accounted only for entertainment/vacation expenses that Lutisha paid for out of pocket, her frequent flyer miles were effectively used to reduce her expenses.

¶47   For both of the foregoing reasons, we determine that the district court did not abuse its discretion in its treatment of Lutisha's frequent flyer miles.

D.    Inclusion of Stock Grants in John's Income

¶48   John contends that the district court abused its discretion in calculating his gross income as well. The court determined John's monthly gross income to be $27,708.00. The court again relied on Lutisha's expert's calculations in making this determination, which calculations included amounts for John's vested RSUs. The court relied on Lutisha's expert's testimony that "even if the stock received by [John] is restricted stock, it becomes income in the year in which it vests." The court also explained that it was including the stock in its income calculation because "[John's] employment contract and work/payment history indicate that [he] regularly receives stock options and bonuses as part of his regular income/compensation."

¶49   John contests the inclusion of the vested stock in the calculation of his income. He contends that this inclusion was an abuse of discretion because the example sources of "gross income" listed in Utah Code section 78B-12-203(1) all have values that "can be determined," while the value of unliquidated stock

"cannot be determined" until it is liquidated.[6] He also argues that the inclusion of the vested stock in the calculation of his income was an abuse of discretion because the stock "represents income not actually realized" since he "does not have free access to trade or liquidate the stock at the time of vesting."

¶50    We first observe that "income" in this context is defined to include "all gain derived from . . . labor," Utah Code § 78B-12-102(14)(b), and that "gross income" is defined to include "prospective income from any source," *id.* § 78B-12-203(1). Under these definitions, the value of vested stock that a person is anticipated to receive in exchange for labor falls squarely within the statutory definition of gross income. John does not dispute this point, as he concedes that the value of vested but unliquidated stock "could fit in 'prospective income from any source.'"

¶51    We next observe that John is mistaken in his assertion that the example sources of gross income listed in section 78B-12-203(1) all have values that can be determined, while the value of vested but unliquidated stock cannot be determined. One reason John's assertion is not correct is that bonuses and gifts—two examples of gross income listed in section 78B-12-203(1)—might themselves take the form of vested stock. More importantly, "gross income" refers to "*prospective* income," *id.* (emphasis added), in other words, income that a person is anticipated to

---

6. Specifically, section 78B-12-203(1) says that "'gross income' . . . may include salaries, wages, commissions, royalties, bonuses, rents, gifts from anyone, prizes, dividends, severance pay, pensions, interest, trust income, alimony from previous marriages, annuities, capital gains, Social Security benefits, workers' compensation benefits, unemployment compensation, income replacement disability insurance benefits, and payments from 'nonmeans-tested' government programs." Utah Code § 78B-12-203(1).

receive in the future. Thus, as to every category of income—wages, commissions, bonuses, dividends, capital gains, vested stock, etc.—when a court calculates a person's prospective income, it is making a prediction, based on current data, of the value the person will receive in the future. And as to every category, the actual future value may end up being different from the amount predicted. For this reason, the code allows for adjusted alimony orders and new child support orders when there is a substantial change between a party's future income as anticipated and the party's future income as it turns out to be. *See id.* §§ 30-3-5(11)(a), 78B-12-210(9). The fact that with stock there is uncertainty both as to what its value will be when it is received in the future and as to what its value will be when it is liquidated thereafter does not convince us to require exclusion of stock received in exchange for labor from gross income calculations.[7]

¶52    John's other assertion is that the inclusion of the vested stock as part of his gross income was an abuse of discretion because of the stock's nonliquidity at the time of its vesting. At one level, John's point is well taken: because "the overarching aim of a . . . [divorce] decree . . . is to achieve a fair, just, and equitable result between the parties," *Dahl v. Dahl*, 2015 UT 79, ¶ 25, 459 P.3d 276 (cleaned up), if the inclusion of a nonliquid asset as part of a party's income makes it unduly difficult or impossible for that party to comply with a payment obligation calculated based on his or her income, equity may require the exclusion of that asset from the income calculation. But the burden of demonstrating that

---

7. John further argues that the stock grants in his case are only guaranteed in the current contract term and may not be included in future contracts with his employer. But here again, the fact that income (in all its sources) might change in the future does not impact the district court's need to determine prospective income based on data available at the time of divorce, and if John's compensation substantially changes in the future, modification may be sought to address the change.

the inclusion of a particular form of income in the income calculation results in an inequity is on the party challenging the income calculation. *See Lamb v. Lamb*, 2024 UT App 16, ¶ 39, 545 P.3d 273 (stating that "the party challenging" an award "adjusting the financial and property interests of the parties" has the "heavy burden" to show "that such a serious inequity has resulted as to manifest a clear abuse of discretion" (cleaned up)). And here, John has made an insufficient showing of inequity resulting from inclusion of his RSUs as part of his gross income.

¶53    Although John points to Lutisha's expert's testimony that the RSUs are "restricted in trading" and that there are "additional limitations on trading when the shares are held by an affiliate or an insider like [John]," Lutisha's expert testified only in general terms:

> So in order to sell those shares, you have to hold them for a certain period of time, but you also have to submit forms that indicate your intent to sell, and then . . . depending on what the limitations are on selling shares of a particular company that you own shares in, you may have to hold those shares for additional periods.

Thus, his testimony was ultimately unhelpful to a determination of what restrictions were in place in this case. In fact, when questioned more specifically as to the restrictions generally in effect for individuals in John's circumstances, Lutisha's expert responded, "Well, it really varies significantly from one company to another and one stock program to another. And so . . . there aren't general parameters that I could give you. But RSUs that I've seen vary dramatically as to how the insiders can trickle shares into the stock market." To demonstrate a restriction on liquidity sufficient to render the district court's inclusion of the RSUs in John's income an abuse of discretion, John would need to direct us to evidence showing what particular restrictions were placed

on the RSUs he received. It is not enough for John to argue, without more, that some restrictions apply. Accordingly, John has failed to show that the district court abused its discretion in relying on Lutisha's expert's calculation of John's income, including the vested restricted stock.

## II. Lutisha's Expenses

¶54   John argues that several of Lutisha's expenses "are unreasonably high, not actually incurred/or paid by other resources . . . , or not ongoing after the divorce." We address each of the specifically challenged expenses in turn.

### A.   Additional Credit Card Payments

¶55   John first challenges Lutisha's "additional credit card payments" expense of $2,000.00. He argues that because Lutisha "inferred that all of her expenses are paid via credit card," this "means additional payments on the card each month are going to pay for other stated monthly expenses that are charged to that card." But that line item appears to address pre-existing credit card debt and therefore would not be duplicative of other listed expenses. John has pointed to no evidence to the contrary; therefore, he has not demonstrated an abuse of discretion in the court's treatment of this expense.

### B.   Lutisha's Personal Loan

¶56   As we discuss more fully below, as part of its property division, the district court determined that Lutisha's personal loan was part of the marital estate. *See infra* ¶ 83. John argues that because he was therefore "responsible for half the value of [Lutisha's] personal loan," the court should have halved Lutisha's listed monthly expense for payment on this debt and shifted the other half to his monthly expenses. However, it appears that this issue was not preserved for our review. We do not see that the issue was raised in any of the portions of the record John cites as

having preserved it—including his counter-request for reconsideration that asks for several other of Lutisha's expenses to "be scrutinized." *See generally* Utah R. App. P. 24(a)(5) (requiring an appellant to provide either "citation to the record showing that the issue was preserved for review" or "a statement of grounds for seeking review of an issue not preserved"). "Parties are required to raise and argue an issue in the district court in such a way that the court has an opportunity to rule on it." *Issertell v. Issertell*, 2020 UT App 62, ¶ 21, 463 P.3d 698 (cleaned up). "When a party fails to raise and argue an issue in the district court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *Id.* (cleaned up). Because no such exception is argued here, we do not reach this issue.

C.     Maintenance of the Park City Property

¶57     John contests Lutisha's monthly expense of $1,792.84 for "real estate maintenance." He argues that this expense is "inflated" because it was calculated based, in large part, on $19,086.00 paid to a roofing company, $4,200.00 paid to a fabrication and welding company, and $2,443.61 paid to a plumbing company over a fifteen-month period—expenditures that John contends will not be "ongoing expenses that [Lutisha] will incur after the divorce." Essentially, he contends that using apparently one-time expenditures as the basis for a monthly expense item is an abuse of discretion.

¶58     This argument, while not without force, also raises an issue that was not preserved in the district court. In his post-trial briefing, John stated that the amounts Lutisha claimed as monthly expenses "should be scrutinized as follows." He then presented a chart that identified for scrutiny six of Lutisha's monthly expense line items, including the one for "Real Estate Maintenance." As to that line item, the chart noted in one sentence that while Lutisha's financial declaration "states that the marital expense or standard

for real estate maintenance was [$]284," it states a monthly real estate maintenance expense for Lutisha of $1,792. Following his chart, John asserted simply that the line items identified in the preceding chart had been "padded for an alimony claim."

¶59   "In order to preserve an issue for appeal," the appellant must have "presented [it] to the trial court in such a way that the trial court ha[d] an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (cleaned up). "Merely mentioning an issue . . . without introducing supporting evidence or relevant legal authority does not give the trial court that opportunity." *Allen v. Allen*, 2014 UT App 27, ¶ 19, 319 P.3d 770 (cleaned up). "Rather, to sufficiently raise an issue, even if indirectly, it must at least be raised to a level of consciousness such that the trial judge can consider it." *Id.* (cleaned up). John's mere mention of the discrepancy between the marital monthly real estate maintenance expense and Lutisha's claimed monthly real estate maintenance expense, coupled with the bare assertion that this (and five other claimed expenses) had been "padded for an alimony claim," was insufficient to preserve the issue John raises on appeal. While John asserts on appeal the legal theory that using one-time expenditures as the basis for a monthly expense item is an abuse of discretion, he never articulated that theory to the district court. And while he has identified for this court the specific evidence that supports his argument—i.e., three apparently one-time expenses that Lutisha assertedly used to pad her monthly real estate maintenance expense—he did not identify this evidence for the district court. For these reasons, we conclude that John did not preserve for our review the issue he raises regarding Lutisha's claimed monthly real estate maintenance expense.

D.   Food, Household Expenses, Clothing, and Travel

¶60   John also contests Lutisha's monthly expense of $4,580.70 for "food and household supplies." He argues that the district

court's "adoption of [his] represented marital expenses doesn't support the amounts represented by [Lutisha]." That is, he argues that because the court adopted his calculation for total monthly marital expenses, and because his calculated marital expense for this specific category was $2,945.00, Lutisha's significantly higher asserted expense in this area is suspect and was not "properly reviewed and scrutinized by the court."

¶61   As an initial matter, we observe that John provides no authority suggesting that one party's listed expense for a given category is automatically suspect when it is not in line with another party's calculated marital expense for that same category. Indeed, our case law instructs that a district court need not make a specific finding as to an overall marital expense amount, let alone precise marital expense amounts, for various expense categories. *See Clarke v. Clarke*, 2023 UT App 160, ¶ 57, 542 P.3d 935 ("There is usually no need for a trial court to make a separate specific finding regarding the overall 'marital standard of living' as measured by the total amount of money spent each month by the couple while they were married." (cleaned up)). And although the court in this case accepted as "reasonable" John's monthly marital expense amount of $30,973.02, the court made no such finding concerning the marital expenses listed for any of the specific expense categories. Moreover, we note that there is some variation between the expense categories that John and Lutisha employed and their decisions as to what expenditures belonged in which categories. In fact, one of the arguments John raises is precisely that—that certain amounts Lutisha categorized as household expenses should have instead been categorized as clothing and travel expenses.

¶62   Yet regardless of these variances between the parties' financial declarations and how they categorized certain expenditures, we are ultimately presented with a case where (1) the court determined that the parties had enjoyed quite a comfortable standard of living during the marriage and

ultimately adopted as "reasonable" the overall monthly marital expense of $30,973.02 provided by John and (2) Lutisha based her declared expenses on fifteen months of actual charges made to her accounts, and she provided the court with a document listing all those charges and how she had categorized them.[8] Against this backdrop, the court determined that after deducting the parties' respective temporary legal expenses, their remaining expenses ($21,114.80 for Lutisha and $19,118.19 for John) were "reasonable in light of the marital standard of living." *See id.* ¶ 59 (explaining that a court should "assess[] a party's claimed line-item expenses in light of" the marital standard of living, and explaining that the "marital expenses" column on the parties' financial declarations is "to assist with this process" (cleaned up)). All considered, we do not see a lack of supporting evidence for the district court's decision that these challenged expenses were reasonable. Nor do we see any merit to John's assertion that the court failed to "properly review[] and scrutinize[]" those expenses.

---

8. John suggests that the court erred when it did not require more evidence supporting Lutisha's expenses and "did not find that [Lutisha] met her burden to prove the marital standard of living as required via *Dahl v. Dahl*, [2015 UT 79, 459 P.3d 276,] but instead used [John's] financial declaration to find [Lutisha's] request reasonable." But *Dahl* does not "automatically require[] a court to deny a request for alimony in the absence of documentation." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 101, 507 P.3d 385, *cert. denied*, 525 P.3d 1259 (Utah 2022). "In fact, the [*Dahl*] court explicitly acknowledged that the district court could have imputed a figure to determine the wife's financial need based either on the husband's records of the parties' predivorce expenses or a reasonable estimate of the wife's needs." *Id.* ¶ 102 (cleaned up). Therefore, we do not consider this argument further.

E.      Lutisha's Medical Expenses

¶63    John argues that Lutisha's "expense for health care should be scrutinized as she failed to distinguish between what amounts were for her and [what amounts were for] the children" and that this is problematic because John is already required to reimburse her for half of the children's medical expenses. But again, similar to his objection to Lutisha's personal loan, *see supra* ¶ 56, this particular objection to this line item is not even referenced in his counter-request for reconsideration that identified several expenses that he contended should "be scrutinized," and John does not cite any other portion of the record where this argument was preserved. Accordingly, we do not reach this issue. *See Issertell v. Issertell*, 2020 UT App 62, ¶ 21, 463 P.3d 698.

### III. Alimony Calculation

¶64    John challenges the district court's overall alimony award as inequitable because the amounts of money left to each party after John's alimony payment are not equal. He argues that "the court abused its discretion by awarding [Lutisha] any more than half of the disposable income of the parties on a monthly basis." He points out that the total monthly amount available to Lutisha is $15,876.31 (including her net income of $7,846.00, the child support award of $2,501.00, and the alimony award of $5,529.31) and the amount available to him is $9,571.56 (his net income of $19,409.00 minus the amounts he must pay in child support and alimony). We do not agree that the district court abused its discretion as John contends.

¶65    A proper alimony assessment proceeds as follows:

> First, the court should assess the needs of the parties, in light of their marital standard of living. . . . Next, the court should determine the extent to which the receiving spouse is able to meet [his or] her own needs with [his or] her own income.

> If the court determines that the receiving spouse is able to meet all [of his or] her needs with [his or] her own income, then it should not award alimony.
>
> If the court finds, however, that the receiving spouse is not able to meet [his or] her own needs, it should then assess whether the payor spouse's income, after meeting his [or her] needs, is sufficient to make up some or all of the shortfall between the receiving spouse's needs and income.

*Rule v. Rule*, 2017 UT App 137, ¶¶ 19–20, 402 P.3d 153 (cleaned up). Should the court then encounter the common dilemma that "the parties' combined resources do not stretch far enough to meet the legitimate needs of what are now two households rather than one," the court must apply an "equalization of poverty" approach, ensuring "that when the parties are unable to maintain the standard of living to which they were accustomed during marriage, the shortfall is equitably shared." *Id.* ¶ 20.

¶66 This is precisely the approach followed by the district court. It first addressed Lutisha's financial condition and needs, determining that, after removing her temporary legal expenses, her remaining expenses of $21,224.80 were "reasonable in light of the marital standard of living and in light of [John's] monthly needs." The court then subtracted from this amount Lutisha's net income and the ordered child support, arriving at a shortfall of $10,767.80. The court also addressed John's financial condition, needs, and ability to pay. The court found, after also removing his temporary legal expenses, that John's remaining expenses of $19,118.19 were "reasonable in light of the marital standard of living and in light of [Lutisha's] monthly needs." Then the court determined that John's net income was sufficient to cover all his expenses with a surplus of $290.81 to go toward Lutisha's shortfall. Finally, the court calculated the shortfall that would be remaining after applying John's surplus of $290.81 and,

"[e]qualizing the poverty," divided that remaining shortfall by two. Thus, the court followed exactly the procedures required by Utah law and did not abuse its discretion in arriving at the resulting alimony amount.

¶67   John pushes back, arguing that "[u]nder no circumstances" can the district court's alimony award "be viewed as equitable" because Lutisha will be left with a higher net income than he will be left with. John argues that the more equitable result would be "each party having 50% of the disposable income." But "equalization [of the parties' standards of living] does *not* require a court to award alimony so that each party is left with an equal monthly income. Rather, it requires a court to divide the shortfall of income equitably between the parties in light of each party's demonstrated needs as well as the other relevant circumstances in the case." *Id.* ¶ 21 (emphasis added) (cleaned up). Indeed, we have previously vacated alimony awards for doing exactly what John urges here—equalizing the money each party has at his or her disposal instead of equalizing the shortfall. *See Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 52, 402 P.3d 219 ("[B]ecause the court had already determined that the expenses of each party were reasonable, its decision to equalize *income* rather than *shortfall*—even though [the wife's] needs were greater than [the husband's]—appears to have left [the wife] to bear significantly more of the burden of insufficient resources than [the husband]."); *Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 12, 80 P.3d 153 ("Here, the trial court never determined [the wife's] needs based on the parties' historical standard of living. Instead, the trial court engaged in an effort to simply equalize income. In attempting to equalize the parties' income rather than going through the traditional needs analysis, the trial court abused its discretion."). Thus, John's argument on this point is unavailing.

## IV. Property Division

¶68 Finally, John challenges the district court's treatment of several pieces of marital property. We address each in turn.

### A. John's Stock Grants

¶69 John argues that because the district court included in John's income the value of the stock he received from his employer, the court's inclusion of that stock in the marital estate as well amounted to "double-dipping." We are unconvinced. While the court considered the value of one year's worth of vested stock when it calculated John's income, the purpose of that calculation was to provide a prospective income number to serve as a basis for determining alimony and child support awards going forward. In contrast, the court included stock in the marital estate because there was an existing accrual of stock that had previously been given to John by his employer. The court including one year's worth of anticipated future stock receipts in John's prospective income and separately considering already-accrued stock in its division of the marital estate is no different from a court including a party's anticipated salary in that party's prospective income and separately including in the marital estate the already-paid salary remaining in the parties' bank accounts when it divides the marital estate. The court did not abuse its discretion by considering the stock in both contexts.

¶70 John also argues that if any amount of already-received stock is marital property, it should only be the vested portions of stock. Yet John cites no authority indicating that it would be an abuse of discretion for the court to treat granted but unvested stock as part of the marital estate when the evidence is that the stock will vest over a moderate term as a matter of course. "An appellate court is not a depository into which parties may dump the burden of their argument and research," and John's inadequate briefing on this point "is by definition insufficient to discharge [his] burden to demonstrate trial court error." *Andersen*

*v. Andersen*, 2015 UT App 260, ¶ 6, 361 P.3d 698 (per curiam) (cleaned up).

¶71   John next argues that the values assigned to the stock "were arbitrary and place [an] unreasonable risk on [John]." But the values placed on the stock are the "current balance" values given to the stock by John himself in his most recent financial declaration, making those values anything but arbitrary. John's real point in this regard seems to be that because the value of the stock will almost certainly change in the future, the court abused its discretion by assigning it a present value for purposes of summing and dividing the marital estate. However, the court's approach was no different from the one we routinely allow courts to take with other marital assets—such as homes and vehicles—that are valued as of the time of trial and then awarded to one party as part of the division of marital property, despite the fact that their value will almost certainly change. "The valuation of marital property is necessarily a snapshot in time, and such a moment does not consider the myriad situations in which the value of the parties' property might be positively or negatively affected in the future." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 97, 507 P.3d 385 (cleaned up), *cert. denied*, 525 P.3d 1259 (Utah 2022).

¶72   John also argues that the court did not "consider the tax consequences of the asset," if it is ever sold, when valuing the stock and awarding it to John as part of the property division. Yet it is not clear that John will ever liquidate the stock, and "we do not generally expect courts to speculate about hypothetical future tax consequences." *Id.* (cleaned up).

¶73   Finally, John argues that the court should have mitigated the future uncertainty of the stock values by "adopting a different form of distribution," such as dividing the vested stocks or ordering John to liquidate the stock as it becomes available and provide half the proceeds to Lutisha. But such an approach goes

against the district court's responsibility to "equitably distribute [marital property] with a view toward allowing each party to go forward with his or her separate life." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 27, 440 P.3d 757 (cleaned up); *see also Gardner v. Gardner*, 748 P.2d 1076, 1079 (Utah 1988) ("The purpose of divorce is to end marriage and allow the parties to make as much of a clean break from each other as is reasonably possible. An award of deferred compensation which ties a couple together long after divorce can frustrate that objective."). We therefore cannot say that the court's determination to not delay the division of the stock was an abuse of its discretion.

¶74　In sum, each of John's arguments related to the stock grants is unavailing. We see no abuse of discretion in the court's treatment of the stock.

B.　John's 2021 Bonus

¶75　John next argues that the district court should not have included his bonus of $28,125.00 from the first quarter of 2021 as a separate item in the marital estate. He asserts that the bonus had already been deposited into his bank accounts that were subject to equitable division and, therefore, that the bonus was essentially counted twice. But as Lutisha points out, the total value of those other accounts combined (approximately $3,400.00) was far less than the bonus amount, suggesting that John had either spent the bonus or not deposited it into those accounts as claimed. And John has not shown that, if spent, the bonus was applied to marital costs. Thus, we cannot say that it was an abuse of discretion for the court to count the bonus as a separate item in the marital estate and award it to him.[9]

---

9. John raises a separate plain error argument with regard to his bonus; however, "plain error review is not available in ordinary civil cases unless expressly authorized by rule." *Kelly v. Timber*

(continued…)

C.      John's Travel Credit

¶76      In the fall of 2020, John booked travel to Bora Bora for himself and the parties' children for April 2021. The trip later had to be canceled when Bora Bora was closed due to the COVID-19 pandemic. The court included the resulting travel credit of $15,426.57 as part of the marital estate and awarded it to John as part of the property division. The court's reasoning was as follows: "The [c]ourt notes that while [John] provided updated bank statements at trial showing he received a refund for the travel, the refund is not reflected anywhere else and thus should be included in the division of property."

¶77      John contests this award, arguing that the court's reasoning "does not make sense on its face." He asserts that "the evidence supports this credit being to an account [that] was subject to equitable division at the time of trial"; in other words, because the travel credit served to reduce the marital debt on the credit card, the travel credit was already accounted for when the reduced credit card debt was included in the equitable property division. We disagree that this is what happened.

¶78      Although the district court could have provided a clearer explanation, we understand the court to have recognized that although John had provided an updated credit card statement at the time of trial showing travel refunds, those refunds were not reflected on the prior statements before the court, which the court used to determine the assets and debts of the parties. Thus, it was not the case that these travel refunds reduced the marital debt that was before the court when it determined the assets and debts of

---

*Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 44, 507 P.3d 357; *see also Duffin v. Duffin*, 2022 UT App 60, ¶ 36 n.7, 511 P.3d 1240 (applying this rule in a divorce case), *cert. denied*, 525 P.3d 1262 (Utah 2022). We therefore do not address this argument—or any other plain error arguments—further.

the parties. The numbers support this interpretation: the marital debt on the credit card that was allocated to John was $44,484.00 on the statement that the court used when determining the assets and debts of the parties, and the balance on that card as reflected on the more recent statement, provided at trial, showed an outstanding debt of only $29,202.72—a difference quite close to the amount of the travel-related refund. Because the travel refund was not reflected in the documents on which the court based its property division, and because John received the refund after the date of those documents, the court did not abuse its discretion by separately including the amount of the travel-related refund as marital property and allocating it to John.

D.    John's Furniture

¶79    John argues that the furniture at the Park City property was worth more than the furniture at the Coalville property and, therefore, that the district court abused its discretion in not treating the $26,318.86 that John spent on new furnishings for his primary residence (an apartment in Park City) as rectifying this imbalance. Instead, the court determined that because "credible trial evidence" showed that the Park City property and the Coalville property had "comparable items that are comparable in value," it was "reasonable and equitable" to award Lutisha the "furniture, personal property, and the like" at the Park City property and to award John the "furniture, personal property, and the like" at the Coalville property. The court thus considered the $26,318.86 value of the newer furniture as a separate item of marital property subject to division. John argues, however, that "evidence presented to the court supports an equitable finding that the property in each [party's] possession and residences awarded to them equally offset the other," that is, that including the value of the new furniture in John's apartment "would be sufficient to offset the difference in value" of the furniture located at the other two properties.

¶80 "Generally, district courts have considerable discretion concerning property distribution in a divorce proceeding and their determinations enjoy a presumption of validity." *Dahl v. Dahl*, 2015 UT 79, ¶ 119, 459 P.3d 276 (cleaned up). "[A]n appellate court's role is not to reweigh the evidence presented at trial but only to determine whether the court's decision is supported by the evidence." *Barrani v. Barrani*, 2014 UT App 204, ¶ 24, 334 P.3d 994. Here, John has provided no citation or argument showing how the court's decision was not supported by the evidence. John's briefing simply points out that the court was provided with photographs "of both properties and the furniture therein" and then asserts that "[t]he evidence presented to the court" was sufficient to support a different finding. This bald assertion does not convince us that the court's decision was not supported by the evidence before it. Thus, we see no abuse of discretion on this point.

¶81 Additionally, John argues that even if the new furniture is subject to division as marital property, there was no evidence that the furniture "maintains the same value as it had at the time of purchase more than eighteen months prior to trial." Given, however, that the court was presented with evidence that this furniture was only eighteen months old and slightly used, and given that John presented no evidence of its depreciated value, we see no abuse of discretion in the court's reliance on the purchase price amounts to assess the value of the furniture.

E.     John's Requested Reimbursement of Marital Expenses

¶82 The district court refused to award reimbursement to John for half of $62,304.63 that he claimed to have spent "maintaining the marital property and expenses," explaining that John "did not provide credible evidence that these were in fact marital expenses" and citing a few examples of listed expenses that were non-marital, such as "clothing purchases, contact lenses, Weller Recreation, and Marine Products." John contests this

determination, arguing, among other things, that his documentation also showed payments toward maintenance of marital property such as the mortgage, HOA fee, and insurance on the Coalville property, as well as insurance on the parties' boat and certain ATVs. But each of John's arguments on this point asks us to reassess credibility and reweigh the evidence, something that, again, we will not do, *see Barrani v. Barrani*, 2014 UT App 204, ¶ 24, 334 P.3d 994. And John's general assertions do not demonstrate that the court's finding that the evidence John provided was not "credible evidence" of marital expenses was not supported by the evidence. We therefore see no abuse of discretion in the court's refusal to award the requested reimbursement.

F.      Lutisha's Personal Loan

¶83    John contests the inclusion in the marital estate of the $100,000.00 personal loan that Lutisha obtained to pay expenses while the parties were separated. He argues that because "the majority of the debt incurred and paid off with that loan were for [Lutisha's] attorney fees," including the loan in the marital estate is contrary to the district court's requirement that the parties be responsible for their own attorney fees. Although John overstates Lutisha's admission that her monthly expenses, including her legal fees, may have been paid, in part, by the loan, the real issue here is that John overstates the district court's ruling on attorney fees. The court's order was as follows: "[B]oth [Lutisha] and [John] are awarded financial and property assets in the division of the marital estate in this divorce action . . . . Thus, because both [p]arties have access to financial and property resources, the [c]ourt *now orders* that each [p]arty shall pay for their own attorney fees and costs." (Emphasis added.) Thus, the court's requirement that each party bear his or her own legal fees was in relation to those fees moving forward. We therefore see no conflict in the court's actions with regard to Lutisha's personal loan and, thus, no abuse of discretion.

CONCLUSION

¶84    The district court enjoys broad discretion in addressing issues of income, alimony, and property distribution. And, with just one exception, John has not shown an abuse of that discretion. That exception is the uncertainty regarding the tax rates to be applied to Lutisha's gross income. Thus, we generally affirm the order but vacate the district court's determinations on that one issue. We remand that issue to the district court for clarification and, if necessary, adjustment, recognizing that any adjustment to that item may also necessitate adjustments to the ultimate alimony award and child support award.

_____